475 F.2d 325
 154 U.S.App.D.C. 214
 POTOMAC PASSENGERS ASSOCIATION, Appellant,
v.
CHESAPEAKE & OHIO RAILWAY COMPANY and Baltimore & Ohio
Railroad Company.
NATIONAL ASSOCIATION OF RAILROAD PASSENGERS, Appellant,
v.
CENTRAL OF GEORGIA RAILWAY COMPANY, Southern Railway Company
and National Railroad Passenger Corporation.
 Nos. 71-1321, 71-1546.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 8, 1972.
Decided Jan. 5, 1973.
Certiorari Granted May 14, 1973.
See 93 S.Ct. 2273.
 
 Messrs. Pierre E. Dostert and Gordon P. MacDougall, Washington, D. C., for appellants.
 Mr. Charles A. Horsky, Washington, D. C., with whom Mr. William D. Iverson, Washington, D. C., was on the brief, for appellees Central of Georgia Ry. Co. and Southern Ry. Co.
 Mr. William O. Bittman, Washington, D. C., with whom Mr. Curtis E. von Kann, Washington, D. C., was on the brief, for appellee National R. Passenger Corporation.
 Mr. Robert O. Smith, Jr., Baltimore, Md., was on the brief for appellees Chesapeake & Ohio Ry. Co. and Baltimore & Ohio R. Co. Messrs. Francis M. Shea and Richard T. Conway, Washington, D. C., also entered appearances for appellees in No. 71-1321.
 Before BAZELON. Chief Judge, and WRIGHT and WILKEY, Circuit Judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 This consolidated appeal consists of two separate cases, each concerning interpretation of the recently enacted Rail Passenger Service Act of 1970, 45 U.S.C. Sec. 501 et seq. (1970) (hereinafter referred to as the Amtrak Act). These cases were initially consolidated because it appeared that they presented the same or closely related legal issues, namely (1) whether parties other than the Attorney General, employees and employee representatives have standing to sue the National Rail Passenger Service Corporation (hereinafter Amtrak) or individual railroads for violations of the Amtrak Act; (2) whether federal district courts have jurisdiction over suits brought by litigants other than the Attorney General, employees and employee representatives to enjoin Amtrak or individual railroads from violating the Amtrak Act; and (3) whether the Amtrak Act creates a private right of action in favor of parties injured by violations of the Act.
 
 
 2
 It now appears, however, that the appeal in No. 71-1321 involves a question much different from those listed above, namely: Does a federal district court have jurisdiction to determine whether a specific train provides "intercity rail passenger service" or "commuter and other short-haul service" within the meaning of the Amtrak Act? If the train provides "intercity rail passenger service" it may properly be discontinued under the authority of the Amtrak Act without any review by the regulatory commissions of the states through which it passes or by the Interstate Commerce Commission. If it provides "commuter and other short-haul service," on the other hand, its discontinuance is neither authorized nor prohibited by the Amtrak Act, but rather is subject to the pre-existing jurisdiction of state regulatory commissions or the ICC. To avoid any further confusion between the issues involved in these two cases, our opinion will treat each case separately.
 
 No. 71-1546
 
 3
 This case requires us to decide whether injured and aggrieved parties have standing to seek injunctions against violations of the Amtrak Act, or whether Section 307 of the Act, 45 U.S.C. Sec. 547, bars suits by all parties other than the Attorney General of the United States, employees and employee representatives. Since the case is here on an appeal from a dismissal for lack of standing to sue and the District Court never reached the merits, we may accept plaintiff's-appellant's version of the facts. Appellee Central of Georgia Railway Company (Central) filed a notice of discontinuance[1] for its "Nancy Hanks" passenger train which operates between Savannah and Atlanta, Georgia, and for two other trains operating between Albany, Georgia and Birmingham, Alabama. Appellant National Association of Railroad Passengers, a national organization of railroad patrons, sought to enjoin the discontinuances on the ground that they violated Sections 404(a) and 802 of the Amtrak Act, 45 U.S.C. Secs. 564(a) and 642.
 
 
 4
 Section 802 provides that "no railroad may discontinue any intercity rail passenger service whatsoever other than in accordance with the provisions of this chapter * * *." Section 404(a) bars a railroad from discontinuing any of its intercity passenger trains prior to January 1, 1975, unless that railroad has entered into a contract with Amtrak pursuant to Section 401(a)(1) of the Act, 45 U.S.C. Sec. 561(a)(1). The latter provision authorizes Amtrak to contract with a railroad "to relieve the railroad * * * of its entire responsibility for the provision of intercity rail passenger service." Although Central has entered into a contract with appellee Amtrak to relieve Central of its entire responsibility for intercity rail passenger service, appellant contends that Central and Amtrak have not complied with Section 401(a)(1) because Central is but a subsidiary of appellee Southern Railway Company (Southern) which has not entered into a contract with Amtrak. In appellant's view, then, the Act requires that Amtrak either enter into a contract to relieve Southern of its entire responsibility for intercity rail passenger service or enter into no contract at all. After oral argument on appellant's motion for a temporary restraining order, the District Court dismissed the action on the ground that appellant did not have standing to maintain this action under Section 307 of the Act. We reverse and remand.
 
 
 5
 * The parties have suggested several characterizations of the issue presented. Appellant accepts the "standing" characterization employed by the District Court. Central and Southern suggest that this is incorrect and that the real issue is whether a private right of action exists to restrain an alleged violation of the Amtrak Act. Amtrak suggests that the issues are, first, whether the District Court has jurisdiction to entertain this action at the instance of this plaintiff and, second, whether the action of Amtrak and the railroads is reviewable at the behest of this plaintiff.
 
 
 6
 The fine distinctions among the doctrines of standing, jurisdiction, reviewability, and causes of action often pose thorny problems for the law. Compare Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), with Barlow v. Collins, 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Mr. Justice Brennan, concurring in the result and dissenting). Compare Bell v. Hood, 327 U.S. 678, 679, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (majority opinion), with id. at 685, 66 S.Ct. 773 (Mr. Chief Justice Stone, dissenting). Fortunately, however, we need not resolve these problems here, for in this case analysis of all these doctrines leads to the same conclusion-allowing adjudication of the merits. Our opinion focuses on standing, but we will also demonstrate that analyzing the case under the doctrines of jurisdiction, reviewability, and private causes of action achieves an identical result.
 
 II
 
 7
 At the outset, we reject the position that the doctrine of standing is wholly inapplicable to this case. It is argued that the standing doctrine has developed solely in the context of determining what persons or groups may challenge the action of a government official or agency, a matter not involved in this case since the Amtrak Act specifically provides that Amtrak is not an agency or instrumentality of the federal government. See 45 U.S.C. Sec. 541. Most applications of the doctrine of standing, it is true, involve review of administrative agencies. See, e. g., Data Processing Service v. Camp, supra; Barlow v. Collins, supra; Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). However, the doctrine is by no means limited to such situations. The question of standing arises in determining who is a proper plaintiff to adjudicate the constitutionality of statutes and ordinances. See Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Baker v. Carr, 369 U.S. 186, 204-208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); City of Chicago v. Atchison, Topeka & Santa Fe R. Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958). More relevant to our own case, standing has been recognized as an issue in determining who is a proper plaintiff to assert that a corporation created by the Government is violating its statutory authority. See Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).
 
 
 8
 A. The applicable standard.
 
 
 9
 Recent Supreme Court cases have announced a three-part test to determine whether a plaintiff has standing to seek judicial review of administrative action. As set forth in Data Processing those tests are: (1) whether the plaintiff has alleged that he suffered injury in fact, economic or otherwise, 397 U.S. at 152, 90 S.Ct. 827; (2) whether the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question, 397 U.S. at 155-156, 90 S.Ct. 827; and (3) whether judicial review has been precluded by the legislature, 397 U.S. at 156, 90 S.Ct. 827. See also Barlow v. Collins, supra, 397 U.S. at 164-165, 90 S.Ct. 832. It appears from Data Processing, a case involving review of administrative action, that this tripartite test represents both a formulation of Article III's "case" or "controversy" requirement[2] and an interpretation of the Administrative Procedure Act (APA), 5 U.S.C. Secs. 701 (a)(1) and 702 (1970). See Data Processing Service v. Camp, supra, 397 U.S. at 153, 156, 90 S.Ct. 827. See also Barlow v. Collins, supra, 397 U.S. at 169-170, 173-175, 90 S.Ct. 832 (Mr. Justice Brennan, concurring in the result and dissenting). The question arises, then, whether the same tripartite test should govern standing to sue a corporation that is neither an agency of the federal government nor subject to the APA.
 
 
 10
 Public policy favors adopting a standing test as liberal as that which has arisen in the administrative law context to determine whether a given plaintiff can sue a congressionally created corporation to enjoin it from violating its enabling statute. A significant aspect of recent standing decisions is a recognition that judicial review is necessary to ensure the integrity of federal regulatory programs, an integrity that is violated as much when a corporation created by the Government violates its enabling act as when a Government agency violates the law. See Ballerina Pen Co. v. Kunzig, 140 U.S.App.D.C. 98, 102 n. 8, 433 F.2d 1204, 1208 n. 8 (1970), cert. dismissed, 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971). What we said there with respect to administrative agencies is also pertinent to judicial overview of the actions of Government-created corporations:
 
 
 11
 "* * * Logic tells us that Congress lays down the statutory framework within which the various agencies it establishes are to operate with very definite goals in mind-the agencies are designed to function according to the will of Congress; they are not given life, breadth and scope of their own to function as they see fit; rather, they must function as Congress intended them to function, * * *"
 
 
 12
 140 U.S.App.D.C. at 101-102, 433 F.2d at 1207-1208.
 
 
 13
 It is also important to note that, while the Amtrak Act states that Amtrak is not a Government agency, the corporation has several features making it, in the words of the Secretary of Transportation, "quasi-public."[3] For example, a majority of the corporation's board of directors is appointed by the President. 45 U.S.C. Sec. 543(a). The corporation received its initial financing from the United States Treasury, see 45 U.S.C. Sec. 601, and continued financing is facilitated through Government guarantees on corporate obligations, see 45 U.S.C. Sec. 602. Amtrak's books and records are to be audited by the Comptroller General of the United States, see 45 U.S.C. Sec. 644(2)(A), and the results of audits are to be made available to the Congress, see 45 U.S.C. Sec. 644(2)(B). Because of Amtrak's quasi-public character, and the consequential public interest in ensuring that its actions conform to its legislative mandate, we conclude that the liberal tripartite standing test developed by the Supreme Court in the administrative agency context should be used to determine whether appellant has standing to seek judicial review of actions by Amtrak allegedly in violation of its enabling act.
 
 
 14
 B. Application of the Data Processing standing test to this case.
 
 
 15
 The first two tests are easily satisfied. With respect to the injury in fact requirement, the National Association of Railroad Passengers alleged in its complaint that it has a number of members in the affected area of the State of Georgia who would suffer from any discontinuance of the Nancy Hanks. Compare Sierra Club v. Morton, supra. The interest sought to be protected by the Association is clearly within the zone of interests to be protected by the Amtrak Act. That railroad passengers were the intended beneficiaries of the Act is obvious from the congressional findings and declaration of purpose in Section 101 of the Act, 45 U.S.C. Sec. 501:
 
 
 16
 "The Congress finds that modern, efficient, intercity railroad passenger service is a necessary part of a balanced transportation system; that the public convenience and necessity require the continuance and improvement of such service to provide fast and comfortable transportation between crowded urban areas and in other areas of the country; * * * that the traveler in America should to the maximum extent feasible have freedom to choose the mode of travel most convenient to his needs * * *. * * *"
 
 
 17
 The only complicated issue in this case is the third part of the Data Processing test, namely, whether Congress intended to preclude standing for this plaintiff. It is important to emphasize that we do not begin our analysis of this issue from a neutral posture, but rather from a strong presumption in favor of judicial review. Where there is no express denial of judicial review, the issue is whether "nonreviewability can fairly be inferred," Barlow v. Collins, supra, 397 U.S. at 166, 90 S.Ct. 832, 837, and, as Mr. Justice Douglas emphasized, preclusion of judicial review "is not lightly to be inferred." Ibid. Judicial review "is the rule, and nonreviewability an exception which must be demonstrated." Ibid. It is "'only upon a showing of "clear and convincing evidence" of a contrary legislative intent' that the courts should restrict access to judicial review." Id. at 167, 90 S.Ct. at 838, quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). It is with this strong presumption in mind that we now turn to analyze whether we can infer congressional intent to preclude judicial review from either (1) the language of the Act itself, (2) the legislative history, or (3) the Act's purpose.
 
 
 18
 1. Implications to be drawn from the statute itself.
 
 
 19
 Section 307 of the Amtrak Act, 45 U.S.C. Sec. 547, provides:
 
 
 20
 "(a) If the Corporation or any railroad engages in or adheres to any action, practice, or policy inconsistent with the policies and purposes of this chapter, obstructs or interferes with any activities authorized by this chapter, refuses, fails, or neglects to discharge its duties and responsibilities under this chapter, or threatens any such violation, obstruction, interference, refusal, failure, or neglect, the district court of the United States for any district in which the Corporation or other person resides or may be found shall have jurisdiction, except as otherwise prohibited by law, upon petition of the Attorney General of the United States or, in a case involving a labor agreement, upon petition of any employee affected thereby, including duly authorized employee representatives, to grant such equitable relief as may be necessary or appropriate to prevent or terminate any violation, conduct, or threat.
 
 
 21
 "(b) Nothing contained in this section shall be construed as relieving any person of any punishment, liability, or sanction which may be imposed otherwise than under this chapter."
 
 
 22
 Appellees contend that under the well established maxim of statutory construction expressio unius est exclusio alterius the statute's express provision of standing for the Attorney General, employees and employee representatives must be read as an implied exclusion of standing for other parties. We think too much is made of the maxim in this case. Whatever superficial appeal the maxim may have, courts have often noted that it must be applied with a certain degree of caution. It is only an aid to statutory construction, not a rigid rule of law. Neuberger v. C.I.R., 311 U.S. 83, 88, 61 S.Ct. 97, 85 L.Ed. 58 (1940); Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States, 1 Cir., 312 F.2d 214, 220 (1963), affirmed, 377 U.S. 235, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964); Renken v. Harvey Aluminum (Incorporated), D.Ore., 226 F.Supp. 169, 175 (1963). The Supreme Court has recognized that rules of statutory construction such as this
 
 
 23
 "come down to us from sources that were hostile toward the legislative process itself and thought it generally wise to restrict the operation of an act to its narrowest permissible compass. However well these rules may serve at times to aid in deciphering legislative intent, they long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy."
 
 
 24
 S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 350-351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943) (footnotes omitted). See also Springer v. Philippine Islands, 277 U.S. 189, 207, 48 S.Ct. 480, 72 L.Ed. 845 (1928); F.T.C. v. Standard Motor Products, Inc., 2 Cir., 371 F.2d 613, 617-618 (1967); Hunt Foods & Industries, Inc. v. F.T.C., 9 Cir., 286 F.2d 803, 807 (1960), cert. denied, 365 U.S. 877, 81 S.Ct. 1027, 6 L.Ed.2d 190 (1961); Matheson v. Armbrust, 9 Cir., 284 F.2d 670, 674 (1960), cert. denied, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860 (1961). Another court has noted:
 
 
 25
 "* * * The doctrine expressio unius est exclusio alterius is at best an unreliable basis for ascertaining intention. Its premise is that the draftsman has made a comprehensive review of all possible related provisions, from which the inference is to be drawn that his silence indicates a discriminating judgment of rejection. Such a conclusion usually is unrealistic, for it assumes too much foresight in the draftsman. * * *"
 
 
 26
 Durnin v. Allentown Federal Savings & Loan Assn., E.D.Pa., 218 F.Supp. 716, 719 (1963). See also Note, Implying Civil Remedies From Federal Regulatory Statutes, 77 Harv.L.Rev. 285, 290-291 (1963).
 
 
 27
 It seems reasonable to us that the express provision of standing for the Attorney General was not an attempt to bar other injured and aggrieved parties from bringing suit, but rather an attempt to authorize the Attorney General to bring suit to enforce what otherwise might be viewed as private rights. See Wood v. National Railroad Passenger Corp., D.Conn., 341 F.Supp. 908, 912 (1972). Cf. Allen v. State Board of Elections, 393 U.S. 544, 555 n. 18, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). The very brief explanation of Section 307 in the section-by-section analysis of the House Report comports with this view. "Section 307 authorizes the Attorney General of the United States to sue the corporation or any railroad to prevent acts of omission or commission in violation of this legislation." H.R.Rep.No. 91-1580, 91st Cong., 2d Sess., at 9 (1970), U.S. Code Cong. & Admin.News, p. 4743.
 
 
 28
 That Congress intended to authorize suits by the Attorney General, and not to bar suits by other parties, is also evident in the scope of authority granted to the Attorney General. He is not simply given power to seek injunctions against violations of the Act, but is authorized to bring suit against Amtrak or any railroad for any actions that obstruct, interfere with, or are inconsistent with the policies of the Act. He is not only authorized to remedy ongoing violations, but any threatened violation, interference, refusal, failure or neglect. By singling out the Attorney General, Congress did not attempt to provide the sole means for litigating violations of the Act, but merely emphasized, even to the point of redundancy, that the Attorney General had broad powers to seek equitable relief under the Act. It was quite understandable for Congress to want to make this clear. The proposal to set up a quasi-public corporation to operate the railroads was, in the words of Senator Prouty, the proposal's draftsman, "a departure from the traditional ways of assisting vital segments of our national transportation system."[4] It was, in the words of other members of Congress, "novel," "ingenious," "imaginative," and "innovative."[5] Given the novelty of the proposal, Congress undoubtedly felt that it could neither foresee nor spell out all the kinds of actions by Amtrak or the railroads that might be inconsistent with the Act's policies. Congress therefore want to make it clear that the judiciary, at the behest of the Attorney General, had power to read between the lines of the statute and to enjoin actions or threatened actions which, though not necessarily violations of any express provision of the Act, interfered with the Act's purpose of revitalizing intercity rail passenger service. There is no reason to read into this congressional emphasis an implied purpose to bar other parties from litigating ongoing violations of express provisions of the Amtrak Act.
 
 
 29
 We might also note that were we to adopt appellees' interpretation of the statute Amtrak and the railroads would be unable to sue each other for violation of their mutual obligations under the Act. For example, should a railroad ignore its obligation to compensate Amtrak under Section 401(a)(2) of the Act, 45 U.S.C. Sec. 561(a)(2), Amtrak would be unable to go into court and sue for the money owed since such a suit would be for a failure to discharge a responsibility under the Act and thus within the scope of Section 307. It is hard to believe that, having given Amtrak a broad mandate to revitalize the nation's intercity rail service, the Congress would have hampered it in this fashion. Amtrak is by statute a forprofit corporation, see 45 U.S.C. Sec. 541, and we presume Congress intended it to have those powers vital to a profit-making enterprise, including the power to bring suit against those with whom it contracts. We hesitate to interpret Section 307 in a manner which would deny it that power.
 
 
 30
 Turning to the reference in Section 307 to suits by employees and their representatives, appellees argue that to allow any injured and aggrieved party to sue for violations of the Act would turn this provision into mere surplusage and that such an interpretation should be avoided. See, e. g., McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164 (1938); D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932). We reject this reasoning on two grounds. First, like the Attorney General, employees and their representatives are not only empowered to litigate actual violations of the Act; they can bring suit against any actual or threatened "action, practice, or policy inconsistent with the policies and purposes" of the Act. To permit other parties to seek injunctions against actual violations of express provisions of the Act does not turn this language into surplusage, for labor's authority to sue is much broader. Second, it is reasonable to assume that Congress wanted to take special precautions to make it clear that employees and their representatives had standing under the Act. Because the primary purpose of the Act was to improve intercity rail passenger service for the benefit of passengers, Congress might well have feared that under the Data Processing standing test employees and their representatives would not have been considered members of the class intended to be protected by the legislation, at least not in all cases in which their interests were affected. See Data Processing Service v. Camp, supra, 397 U.S. at 154-156, 90 S.Ct. 827; Barlow v. Collins, supra, 397 U.S. at 164-165, 90 S.Ct. 832. That Congress merely intended to emphasize the rights of labor is evident from other provisions of the Act. For example, Section 405(a), 45 U.S.C. Sec. 565(a), requires railroads to make "fair and equitable arrangements to protect the interests of employees affected by discontinuances of intercity rail passenger service * * *" and other subsections define the substantive content of such arrangements. Despite the clarity of this requirement, Section 401(a) of the Act, 45 U.S.C. Sec. 561(a), again emphasizes that a valid contract under the Act must include protective arrangements for employees. We are therefore confident that, by singling out employees and their representatives in Section 307, Congress was not attempting to prevent other parties from bringing suit, but was simply making it abundantly clear that labor's interests would be protected as well.
 
 
 31
 Since we can explain the express provision of standing in the Attorney General, employees and employee representatives on grounds unrelated to any congressional intent to preclude other injured and aggrieved parties from bringing suit, we cannot reasonably infer from the statutory language an intent to bar other parties from bringing suit, especially in light of the strong presumption in favor of review with which we began our analysis.
 
 
 32
 2. Implications to be drawn from the legislative history.
 
 
 33
 As originally drafted, Section 307 provided jurisdiction "upon petition of the Attorney General of the United States or, in a case involving a labor agreement, upon petition of any individual affected thereby * * *." S. 3706, 91st Cong., 2d Sess., Sec. 307(a) (May 7, 1970), reprinted in Supplemental Hearings, supra note 3, at 44. The National Legislative Director of the United Transportation Union presented the Subcommittee with an amendment that would have deleted the phrase "in a case involving a labor agreement, upon petition of any individual affected thereby" and would have substituted the phrase "of any person adversely affected or aggrieved thereby, including the representatives of the employees of any railroad or of the Corporation."[6] He claimed that the amendment was designed "[t]o provide a legal remedy to any aggrieved person including the duly authorized representatives of the employees of the railroads and of the Corporation for any violations of the Act by the Corporation or by any railroad."[7] Following this testimony, the General Counsel of the Railway Labor Executives Association appeared before the Subcommittee and introduced a similar amendment. He stated:
 
 
 34
 "The third substantive amendment we propose would modify the language of section 307(a) on pages 14 and 15 of the bill so as to provide that any aggrieved party, including employee representatives, could institute legal proceedings for violations of the law.
 
 
 35
 ******
 
 
 36
 * * *
 
 
 37
 "As the bill now reads, only the Attorney General, except in cases involving a labor agreement, could bring such actions * * *."[8]
 
 
 38
 Later, Secretary of Transportation Volpe offered some comments on the proposed amendments. His letter to the Committee stated:
 
 
 39
 "Labor proposes that subsection (a) of section 307 be amended to make sanctions available not only against the Corporation but against all railroads. It also proposes that any person adversely affected or grieved [sic], including employee representatives, be permitted to seek relief.
 
 
 40
 "Sanctions are normally imposed by the Government. Consequently, I would be opposed to permitting 'any person' to seek enforcement of section 307. I would have no objection, however, if the section were revised to permit employee representatives, as well as employees adversely affected, to seek equitable relief."[9]
 
 
 41
 As is evident from the language of Section 307 as enacted, the Committee never adopted the proposed amendment. Rather it changed the phrase "in a case involving a labor agreement, upon petition of any individual aggrieved thereby" to read "in a case involving a labor agreement, upon petition of any employee affected thereby, including duly authorized employee representatives."
 
 
 42
 Appellees suggest that the Committee's refusal to adopt the proposed amendment indicates Congress' intent not to allow any person aggrieved to have standing to sue. While the argument has a superficial appeal, we are constrained to reject its implications. Interpretation of statutes cannot safely rest upon changes made in congressional committee without explanation. Trailmobile Co. v. Whirls, 331 U.S. 40, 67 S.Ct. 982, 91 L.Ed. 1328 (1947). Courts should avoid delving into "legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction." Gemsco, Inc. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 615, 89 L.Ed. 921 (1945). Especially is this true when a court is asked to draw inferences from congressional failure to adopt proposed amendments to legislation. "Logically, several equally tenable inferences could be drawn from the failure of the Congress to adopt an amendment * * * including the inference that the existing legislation already incorporated the offered change." United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 1359, 8 L.Ed.2d 590 (1962).
 
 
 43
 In the instant case we are unable to draw inferences from the legislative history with any confidence. The proposed amendment was never debated or criticized by members of Congress so that failure to adopt the amendment might reasonably be construed to be congressional rejection of that which the amendment provided for. Compare National Automatic Laundry and Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 291, 443 F.2d 689, 706 (1971). The Committee might well have believed, notwithstanding the remarks of railway labor representatives, that Section 307 as originally drafted did not bar suits by all injured and aggrieved parties.[10] Indeed, the only mention of the scope of Section 307 during debate on the floor of Congress suggests that Congress interpreted the section to permit such suits. When the Senate considered the Amtrak Act, it had before it both the proposal by Senators Hartke and Prouty (the one eventually enacted into law) and a competing proposal put forth by Senators Pell and Kennedy. In support of his proposal, Senator Kennedy introduced into the Congressional Record a chart summarizing the basic differences between the two proposals. Looking at the item on the chart called "Sanctions," we find this simple notation to describe both proposals: "In Federal District Court by affected parties for violations of Act." 116 Cong.Rec. (Part 11) 14275 (1970). At least one member of Congress, therefore, thought the Act, as reported from committee, did allow suits by "affected parties." And there is no indication that any member of Congress thought otherwise.
 
 
 44
 Nor do we find it significant that labor representatives testifying at the committee hearings said that the Act, as originally drafted, barred all parties other than the Attorney General and employees from bringing suit. The individual opinions of witnesses at hearings are of dubious value in interpretation of legislation. McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 493, 51 S.Ct. 510, 75 L.Ed. 1183 (1931); Pacific Ins. Co. v. United States, 9 Cir., 188 F.2d 571, 572, cert. dismissed, 342 U.S. 857, 72 S.Ct. 85, 96 L.Ed. 645 (1951); United States v. Kung Chen Fur Corp., 188 F.2d 577, 584, 38 CCPA 107 (1951); Railroad Retirement Board v. Duquesne Warehouse Co., 80 U.S.App.D.C. 119, 122, 149 F.2d 507, 510 (1945), affirmed, 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946).
 
 
 45
 Finally, the Act itself indicates that where Congress intended to preclude judicial review it knew very well how to make its wishes clear. Section 201, 45 U.S.C. Sec. 521, provides that the Secretary of Transportation is to designate a "basic system" of points between which intercity passenger trains shall be operated, and Section 401(b) of the Act, 45 U.S.C. Sec. 561(b), requires Amtrak to operate trains within the basic system unless such trains are being operated by carriers not contracting with Amtrak or by regional transportation agencies. Section 202 of the Act, 45 U.S.C. Sec. 522, expressly provides with respect to review of the Secretary's determination of the basic system: "The basic system as designated by the Secretary shall become effective for the purposes of this chapter upon the date that the final report of the Secretary is submitted to Congress and shall not be reviewable in any court." (Emphasis added.) Congress could just as easily have made clear its desire to limit the right to seek review to the Attorney General and labor by placing the word "only" before the phrase "upon petition of the Attorney General * * *" in the statute. Compare Wood v. National Railroad Passenger Corp., supra, 341 F.Supp. at 911, with Congress of Railway Unions v. Hodgson, D.D.C., 326 F.Supp. 68, 78 (1971). That it failed to do so indicates to us that it had no intent to bar other parties from seeking judicial review.
 
 
 46
 3. Implications to be drawn from the purposes of the Amtrak Act.
 
 
 47
 A command of a statute to preclude judicial review may sometimes be inferred from its purpose. Barlow v. Collins, supra, 397 U.S. at 167, 90 S.Ct. 832. See also Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). It is argued that to allow all injured and aggrieved parties to sue for violations of the Amtrak Act will subject the railroads and Amtrak to crippling litigation, involving massive expenses and distractions, which may well prevent them from devoting adequate time, money and attention to the task for which Congress brought Amtrak into being, namely saving the country's intercity rail passenger service.
 
 
 48
 Although such arguments as these normally carry little weight, they merit some discussion here. The legislative history makes it quite clear that one of Congress' purposes in enacting the Amtrak Act was to enable railroads to discontinue uneconomical trains that were draining their resources. The House Report recognized:
 
 
 49
 "In order to achieve economic viability in a basic rail passenger system, the Secretary [of Transportation] stated that there will have to be a 'paring of uneconomic routes'. * * *
 
 
 50
 "In other words, a rational reduction of present service will be required to save any passenger service. * * *"[11]
 
 
 51
 The legislative history also indicates that one of the faults of the system prior to passage of the Amtrak Act was that uneconomical trains could not be discontinued until after lengthy administrative hearings before the ICC and appeals before three-judge District Courts from ICC rulings.[12] The Amtrak Act dealt with this problem by providing that railroads entering into a contract could immediately terminate all of their intercity rail passenger service. See 45 U.S.C. Sec. 561(a)(1).
 
 
 52
 But we are unable to conclude from this legislative purpose that Congress intended to deny standing to injured and aggrieved passengers. It must not be forgotten that the chief purpose of the Amtrak Act was to save the passenger train from extinction. "The basic purpose of this bill is to prevent the complete abandonment of intercity rail passenger service * * *." H.R.Rep.No.91-1580, supra, at 1, U.S. Code Cong. & Admin.News, p. 4735. Congress intended to ensure survival of the passenger train by enacting an elaborate regulatory system which would encourage railroads to turn over all their intercity passenger service to Amtrak. It was hoped that Amtrak would then "revitalize rail passenger service in the expectation that the rendering of such service along certain corridors can be made a profitable commercial undertaking, particularly with new equipment or advanced vehicles." Id. at 1-2, U.S.Code Cong. & Admin.News, p. 4735.
 
 
 53
 Achievement of Congress' objectives plainly requires compliance with the provisions of the Amtrak Act, and judicial review of Amtrak's actions is necessary if compliance is to be assured. Allowing parties other than the Attorney General and labor to contest violations of the Act is not only fully consistent with, but is also necessary to achieve, this objective.[13] As the Supreme Court noted on another occasion when it was confronted with a statute that provided for review at the behest of the Attorney General without expressly providing for or barring review by other parties:
 
 
 54
 "The achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General. * * * The Attorney General has a limited staff and often might be unable to uncover quickly [violations of the Act]. * * *"
 
 The guarantees of the legislation
 
 55
 "might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement * * *."
 
 
 56
 Allen v. State Board of Elections, supra, 393 U.S. at 556-557, 89 S.Ct. at 827. (Footnotes omitted.) The Attorney General's action in the case which is a companion on appeal to the instant case supports the Court's observations. After the District Court's decision to deny review for lack of standing, a member of Congress sent a letter to the Attorney General asking that he enter the litigation to remove procedural obstacles to adjudication on the merits. In refusing to do so, the Attorney General expressed the belief that he had no power under the Amtrak Act "to sue for a construction of the Act or to enjoin a purely technical violation." He maintained that his only authority was to bring suits "to protect and enhance the legislative purpose."[14] Indeed, appellees in this case have been unable to refer us to a single instance in which the Attorney General has either instigated or participated in litigation under the Amtrak Act, except for a few cases brought by other parties in which he intervened solely to support the defense that parties other than labor and the Attorney General did not have standing to sue. Cf. Allen v. State Board of Elections, supra, 393 U.S. at 556 n. 22, 89 S.Ct. 817. To rely on the Attorney General as the sole source of litigation under the Act, as he would be in cases where labor's interests were not adversely affected, is thus to rest enforcement of the entire regulatory scheme on the Attorney General's virtually unreviewable[15] distinction between a mere "technical" violation and one that seriously interferes with the legislative purpose.
 
 
 57
 Absent some express and definite indication that it intended such a result, we find it difficult to believe that Congress would have hung a program as important as this by such a thin thread. We think such a result is neither compelled by the language of the statute, reasonably to be implied from the legislative history, nor conducive to achievement of the Act's laudable purpose of revitalizing the nation's intercity rail passenger trains. We therefore hold that parties other than the Attorney General, employees and employee representatives who are injured and aggrieved by actions of Amtrak or railroads in violation of the Amtrak Act have standing under that Act to seek injunctions against such actions in federal court.
 
 III
 
 58
 Amtrak suggests that the real issue in this case is not standing, but rather the jurisdiction of the District Court. Focusing on the jurisdictional nature of Section 307, Amtrak argues that by expressly giving the District Court jurisdiction in cases brought by the Attorney General, employees or their representatives Congress intended to deprive the District Court of jurisdiction over suits brought by all other parties. But even were we to accept Amtrak's characterization of the issue presented, we would be unable to agree with its conclusion.
 
 
 59
 Jurisdiction of the District Court need not rest on Section 307. Appellant's complaint alleged jurisdiction on the basis of 28 U.S.C. Sec. 1337 (1970) which provides: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." Appellees' answer to Section 1337 jurisdiction is the Supreme Court's decision in Switchmen's Union v. National Mediation Board, supra. In that case the Supreme Court held that the general grant of jurisdiction in Section 1337 could not be invoked to sustain jurisdiction to review decisions of the National Mediation Board certifying a representative for collective bargaining, even though such a case admittedly seemed to meet the requirements of Section 1337. Switchmen's Union is cited in the Court's opinion in Barlow v. Collins, supra, as authority for the proposition that "[a] clear command of the statute will preclude [judicial] review; and such a command of the statute may be inferred from its purpose." 397 U.S. at 167, 90 S.Ct. at 838.
 
 
 60
 We think Switchmen's Union is obviously distinguishable from our case on several significant grounds. First, the Court admitted in that case that "[i]f the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control." 320 U.S. at 300, 64 S.Ct. at 97. It found that the right of collective bargaining involved in that case was being protected without judicial review since the Mediation Board was determining the appropriate craft or class in which an election should be held. In other words, in that case the Mediation Board was already acting as a neutral body resolving disputes between labor and management or between competing labor groups. In sharp contrast, in our case no neutral administrative body had resolved a dispute between the antagonists-Amtrak and the railroads on the one hand and railroad passengers on the other. Amtrak has simply made a determination about the meaning of its own enabling statute. In this situation we are unable to conclude, as the Supreme Court concluded in Switchmen's Union, that there is considerable question as to whether judicial review would strengthen the rights protected by the legislation. Id. at 301, 64 S.Ct. 95.
 
 
 61
 It is also important to note that the finding of a command of the statute to preclude judicial review in Switchmen's Union was based on the entire history of Congress' treatment of railway labor problems. As the Court emphasized, Congress intentionally left large areas of the field "in the realm of conciliation, mediation, and arbitration." Id. at 302, 64 S.Ct. at 98. To create a new judicially enforceable right in this kind of situation would have been contrary to this long history. In our case, on the other hand, the history of railroad discontinuances indicates that until now administrative and judicial remedies were available at the behest of passengers. As is discussed more fully in our opinion in No. 71-1321, infra, prior to passage of the Amtrak Act railroads had to seek approval of their train discontinuances before either the state regulatory commissions or the ICC. Passenger groups and other affected parties were allowed to intervene and argue their cases in these forums.[16] We cannot help but believe that if Congress had wanted to take away these rights it would have done so in a more explicit fashion. Thus for the same reasons that we found no congressional intent in Section 307 to overcome the strong presumption of standing in favor of persons intended to be protected by legislation, we now find no congressional intent to overcome the general jurisdictional grant in Section 1337.
 
 
 62
 Appellees' final challenge to Section 1337 jurisdiction is to note that Section 1337 merely permits jurisdiction; it does not create a cause of action. See Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 249, 71 S.Ct. 692, 95 L.Ed. 912 (1951). The question then becomes, can a private right of action be implied under the Amtrack Act? We think there is ample precedent for implying such a private cause of action. "[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." Bell v. Hood, supra, 327 U.S. at 684, 66 S.Ct. at 777. When Congress seeks to protect a group such as railroad passengers, we may reasonably imply, absent express and definite indications to the contrary, that Congress intended this group to have judicial relief to achieve the protection Congress intended. See J. I. Case Co. v. Borak, 377 U.S. 426, 431-432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). It is argued that the principle should not apply because railroad passengers are merely indirect beneficiaries of the Amtrak Act. We most heartily disagree. As indicated earlier, the congressional statement of purpose makes clear that the main function of the Amtrak Act was to preserve and improve train service. The object of the legislation was not just trains, but the people who ride them.
 
 
 63
 The private civil action, involving injured individuals acting as private Attorneys General, is becoming an accepted method of policy enforcement. See Gomez v. Florida State Employment Service, 5 Cir., 417 F.2d 569 (1969). See also Note, Implying Civil Remedies From Federal Regulatory Statutes, supra. Not only is it an accepted method, but it is one that the courts have an interest in encouraging. The judicial process works best when those with "a direct stake in the outcome" participate. Sierra Club v. Morton, supra, 405 U.S. at 740, 92 S.Ct. at 1369. It is important that cases be brought by those with "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues * * *." Baker v. Carr, supra, 369 U.S. at 204, 82 S.Ct. at 703. Courts have supported these policies by recognizing private rights of action in a wide variety of situations and refusing to recognize those actions only in those cases where such was the express intent of Congress, see, e. g., Powell v. Washington Post Co., 105 U.S.App.D.C. 374, 267 F.2d 651, cert. denied, 360 U.S. 930, 79 S.Ct. 1449, 3 L.Ed.2d 1544 (1959), or where private actions are inconsistent with other important policies such as exhaustion of administrative remedies, see, e. g., Montana-Dakota Utilities Co. v. Northwestern Public Service Co., supra; B. F. Goodrich Co. v. Northwest Industries, Inc., 3 Cir., 424 F.2d 1349, cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). Neither of these factors is present in the case of the Amtrak Act. We therefore conclude that a complaint alleging a violation of the Amtrak Act states a cause of action arising under an Act of Congress regulating commerce and thus may be litigated in federal district court under Section 1337.
 
 
 64
 Reversed and remanded.
 
 No. 72-1321
 
 65
 On April 1, 1971, appellee Baltimore & Ohio Railroad Company (B & O) filed a notice with the ICC stating that it would discontinue six of its trains effective May 1, 1971. Four of the trains operate between the District of Columbia and Cumberland, Maryland. The other two operate between the District and Baltimore. The notice was filed pursuant to Section 401(a)(1) of the Amtrak Act, 45 U.S.C. Sec. 561(a)(1). That section provides that a railroad which has entered into a contract with Amtrak "shall be relieved of all its responsibilities as a common carrier of passengers by rail in intercity rail passenger service * * *" provided that the railroad give notice of the discontinuance. Appellant Potomac Passengers Association, a group of rail commuters in the Washington, D.C. area, brought this action to obtain a declaration that the trains provided "commuter" rather than "intercity" service and are thus exempt from discontinuance under the Amtrak Act. In addition, appellant sought an injunction against the discontinuances on the ground that they violated theAmtrak Act. The District Court, accepting without comment appellant's characterization of the lawsuit as one for a violation of the Amtrak Act, held that appellant did not have standing to sue under Section 307 of the Act and dismissed the complaint. See Congress of Railway Unions v. Hodgson, supra, 326 F.Supp. at 79-80.
 
 
 66
 Were we to accept this characterization of the lawsuit, the case would present the same issue as that in No. 72-1546, supra, and we would reverse and remand for a hearing on the merits for the same reasons as control that case. It now appears, however, that this characterization is improper. While this lawsuit admittedly seeks a judicial interpretation of a provision of the Amtrak Act, it cannot properly be characterized as a suit for a violation of the Amtrak Act, and it is therefore not controlled by the standing requirement of Section 307. Instead this suit, properly understood, seeks a declaratory judgment that the trains discontinued by B & O provide "commuter" service and are therefore outside the coverage of the Amtrak Act-that is, that their discontinuance is neither authorized nor barred by the Act but is subject to the pre-existing jurisdiction of state regulatory agencies and the ICC. We hold that the District Court has jurisdiction to hear the merits of this declaratory judgment action and therefore reverse and remand.
 
 
 67
 To understand the posture of this case, it is helpful to summarize briefly the history of the law governing passenger train discontinuances. Prior to 1958 discontinuances of all passenger trains, without distinction as to whether they provided intercity or commuter service, required the approval of the appropriate regulatory agency in each of the states in which the train operated. See United States v. City of Chicago, 400 U.S. 8, 11 n. 3, 91 S.Ct. 18, 27 L.Ed.2d 9 (1970). This procedure had many faults which Congress attempted to cure by enacting Section 13a of the Interstate Commerce Act, 49 U.S.C. Sec. 13a. This section gave the ICC the power to approve train discontinuances, again without distinction as to the kind of service-intercity or commuter-provided. The ICC's jurisdiction was not exclusive, however. If a railroad so desired, it could continue to seek authorization for a discontinuance from the appropriate state regulatory agencies. At its option, or after the state commission refused to approve the discontinuance, a railroad seeking to discontinue an interstate train could bypass the state regulatory agencies by filing a notice of proposed discontinuance with the ICC. Unless ordered by the Commission to continue the service in question, the railroad could, 30 days after filing its notice, discontinue the service notwithstanding the laws or constitution of any state or the decision or order of, or pendency of any proceeding before, any court or state authority to the contrary. That is, the jurisdiction of the state agencies was exclusive until a notice of discontinuance was filed with the ICC.[17] Once such a notice was filed, the ICC had exclusive jurisdiction.[18]
 
 
 68
 The Amtrak Act in no way affected this procedure as it applies to passenger trains providing commuter service. The Act applies solely to "intercity rail passenger service," defined in the Act as "all rail passenger service other than (A) commuter and other short-haul service in metropolitan and suburban areas, usually characterized by reduced fare, multiple-ride and commutation tickets, and by morning and evening peak period operations * * *." 45 U.S.C. Sec. 502(5). Without going into the more complicated aspects of the Act, it basically permits railroads that have signed contracts with Amtrak to discontinue their intercity rail passenger service, and it bars railroads that have not signed contracts with Amtrak from discontinuing such service prior to 1975. All references in the Act are to intercity rail passenger service;[19] the Act neither authorizes nor bars discontinuance of trains providing commuter and other short-haul service. It simply has no effect on such trains. This is evident not only from the language of the Act but also from the legislative history.[20] Therefore, a railroad desiring to discontinue a train providing commuter and other short-haul service must seek approval from either the regulatory agencies of the states through which the train passes or from the ICC, just as it did prior to passage of the Amtrak Act.[21]
 
 
 69
 B & O has not sought such approval in this instance because it believes that the trains it discontinued provide intercity rail passenger service, not commuter and other short-haul service. It therefore believes that the discontinuances were authorized under the Amtrak Act. Potomac Passengers Association has requested both a declaration that these trains provide "commuter and other short-haul service" and an injunction against the discontinuances. The issue, then, is whether the District Court has jurisdiction and power to grant either remedy.
 
 
 70
 At the outset, it is evident that Section 307 of the Amtrak Act does not affect the result. That section, by its own terms, applies only to suits seeking equitable relief necessary to prevent or terminate (1) violations of the Act, (2) conduct that is inconsistent with the policies and purposes of the Act or obstructs or interferes with activities authorized by the Act, (3) failure to exercise responsibilities imposed by the Act, and (4) threats of such actions. Discontinuance of a commuter train, however, is not a violation of the Act, is not inconsistent with the policies of the Act, and does not interfere with activities authorized by the Act. The Act has nothing to do with commuter trains. If the trains at issue provide intercity rail passenger service, as B & O contends, there is no question but that their discontinuance is lawful under the Act.[22] If the trains provide commuter and other short-haul service, as appellant alleges, there is no question but that their discontinuance is unlawful-not under the Amtrak Act, but under the laws of the states through which they pass, since approval has admittedly not been sought from either the state regulatory agencies or the ICC.[23] Section 307, therefore, has nothing to do with this case, as is evident from subsection (b):
 
 
 71
 "Nothing contained in this section shall be construed as relieving any person of any punishment, liability, or sanction which may be imposed otherwise than under this chapter."
 
 
 72
 The foregoing discussion also indicates that the District Court has no power to enjoin discontinuance of these trains. If they provide intercity rail passenger service, their discontinuance is concededly lawful. If they provide commuter service, since no notice of discontinuance has yet invoked the jurisdiction of the ICC, their discontinuance is a violation of state, not federal, law.[24] The District Court has no power to issue an injunction enforcing state law in this instance, for to do so would usurp the primary jurisdiction of the state regulatory agencies and would circumvent the procedure established by the state to enforce its own laws.[25] Should B & O seek approval of the discontinuances from the ICC, an injunction would be inconsistent with the ICC's primary jurisdiction.[26]
 
 
 73
 It is equally clear, however, that the District Court has jurisdiction to render a declaratory judgment as to whether these trains provide intercity rail passenger service or commuter and other short-haul service within the meaning of the statute. That is, the court may decide whether discontinuance of these trains is still subject to the jurisdiction of the state regulatory agencies and the ICC or whether they are exempted from such jurisdiction by the Amtrak Act. The sole issue in this case is interpretation of a federal law regulating the railroads, and the case is therefore one meeting the jurisdictional requirements of 28 U.S.C. Sec. 1337 which grants jurisdiction of civil actions arising under any Act of Congress regulating commerce. The power to construe the Amtrak Act and declare the nature of these trains is subsumed within the power granted by the Declaratory Judgment Act, 28 U.S.C. Sec. 2201 (1970). We therefore reverse and remand the case to the District Court with instructions to adjudicate the merits of the controversy and issue appropriate declaratory relief.[27]
 
 
 74
 So ordered.
 
 
 
 [1]
 The Act requires that railroads discontinuing trains give notice in accordance with the notice procedures in Sec. 13a(1) of the Interstate Commerce Act, 49 U.S.C. Sec. 13a(1) (1970). See 45 U.S.C. Sec. 561(a)(1) (1970). Since the purpose of the Act is to allow discontinuances of intercity rail passenger service without approval of either the ICC or state regulatory agencies, this notice does not invoke the jurisdiction of the ICC; it merely serves to give passengers advance warning of the discontinuance. See Ex Parte Order No. 217, 36 Fed.Reg. 5219, 5220 (March 18, 1971); 49 C.F.R. Sec. 1122.9 (Oct. 1, 1972)
 
 
 [2]
 The Supreme Court's most recent cryptic pronouncement on standing seems to indicate that the standing test may be based solely on the APA. See Sierra Club v. Morton, 405 U.S. 727, 732 n. 3, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). See also note 10 infra
 
 
 [3]
 Supplemental Hearings on H.R. 17849 & S. 3706 Before Subcommittee on Transportation & Aeronautics, House Committee on Interstate & Foreign Commerce, 91st Cong., 2d Sess., at 67-68 (1970) (hereinafter cited as Supplemental Hearings)
 
 
 [4]
 S.Rep.No.91-765, 91st Cong., 2d Sess., at 77 (1970)
 
 
 [5]
 116 Cong.Rec. (Part 27) 36597, 36598, 36895 (1970)
 
 
 [6]
 Supplemental Hearings, supra note 3, at 122
 
 
 [7]
 Ibid
 
 
 [8]
 Id. at 134
 
 
 [9]
 Id. at 85
 
 
 [10]
 It is also conceivable that the Committee rejected labor's proposed amendment because it may have constituted an unconstitutional expansion of federal jurisdiction. As quoted in text, the amendment would have permitted any person "adversely affected or aggrieved" to bring suit. (Emphasis added.) Since the provision was worded in the alternative, it may reasonably have been read to allow persons who are aggrieved but not injured to bring suit. The Supreme Court had indicated, prior to passage of the Amtrak Act, that the "case" or "controversy" requirement of Article III required that the plaintiff himself be injured in fact. See, e. g., Data Processing Service v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). There was substantial scholarly debate as to whether the Court's standing tests were in fact constitutionally required. See, e. g., Berger, Standing to Sue in Public Actions: Is it a Constitutional Requirement?, 78 Yale L.J. 816 (1969)
 If injury in fact was required by Article III's case or controversy requirement, then settled principles of law, dating back to Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), indicated that Congress had no power to expand the jurisdiction of federal courts beyond the scope of Article III to cases in which the plaintiff was not injured in fact. Congress might well have believed, therefore, that the proposed amendment was unconstitutional.
 It was not until after enactment of the Amtrak Act that the Supreme Court, in a footnote seemingly inconsistent with recent pronouncements such as Data Processing, said that "where a dispute is otherwise justiciable" the question of standing "is one within the power of Congress to determine." Sierra Club v. Morton, supra note 2, 405 U.S. at 732 n.3, 92 S.Ct. at 1365.
 
 
 [11]
 H.R.Rep.No.91-1580, 91st Cong., 2d Sess., at 3 (1970), U.S.Code Cong. & Admin.News, p. 4737. (Emphasis in original.)
 
 
 [12]
 Hearings on H.R. 12084 etc., Before Subcommittee on Transportation & Aeronautics, House Committee on Interstate & Foreign Commerce, 91st Cong., 1st Sess., at 307 (1969). See, e. g., Chicago & Eastern Ill. R. Co. Discontinuance of Trains, 331 I.C.C. 447 (1968), appeal dismissed, sub nom. City of Chicago v. United States, N.D.Ill., 294 F.Supp. 1103, reversed & remanded to District Court, 396 U.S. 162, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969), vacated & remanded to ICC, N.D.Ill., 312 F.Supp. 442, reversed & remanded to District Court, 400 U.S. 8, 91 S.Ct. 18, 27 L.Ed.2d 9 (1970); Chicago & Eastern Ill. R. Co. Discontinuance of Trains, 333 I.C.C. 626 (1968), reversed & remanded, N.D.Ill., 308 F.Supp. 645 (1969), prob. jurisdiction noted, 398 U.S. 957, 90 S.Ct. 2172, 26 L.Ed.2d 541 (1970), judgment vacated & case remanded to District Court with directions to remand to ICC, 400 U.S. 987, 91 S.Ct. 449, 27 L.Ed.2d 434 (1971)
 
 
 [13]
 It is important to note that, even though allowing suits by parties other than the Attorney General and employees will doubtless result in increased litigation, such litigation will not burden the railroads as much as litigation under pre-Amtrak procedure. The major problem with pre-Amtrak procedure was not the presence of litigation, but the fact that litigation involved, in the case of the ICC, determining the nebulous question of whether the service "is required by public convenience and necessity and will not unduly burden interstate or foreign commerce * * *." 49 U.S.C. Sec. 13a(1) (1970). Resolution of this issue required numerous public hearings at various sites along a given train's route and analysis of complex corporate financial records. It is doubtful that issues arising under the Amtrak Act will involve resolution of such difficult factual issues or will entail the same amount of time such factfinding consumes. For example, in the present case the facts are undisputed and the sole question is the legal issue of whether the Act permits Amtrak to contract with a subsidiary without contracting with its parent
 
 
 [14]
 Letter from Assistant Attorney General L. Patrick Gray, III, to Congressman John Slack, Nov. 19, 1971, in appellant's Reply to Supplemental Memorandum
 
 
 [15]
 See Powell v. Katzenbach, 123 U.S.App.D.C. 250, 359 F.2d 234 (1965), cert. denied, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1966)
 
 
 [16]
 See 49 C.F.R. Sec. 1122.4(d) (Oct. 1, 1972)
 
 
 [17]
 See generally Kennedy v. Baltimore & Ohio R. Co., 342 I.C.C. 19, 21 (1972): "It is well settled that section 13a(1) is a permissive section of the act and does not impose any requirement upon a carrier to file a notice of proposed discontinuance. The first sentence of the statute states that a carrier 'may, but shall not be required to, file with the Commission * * *.' [Emphasis supplied.] If a carrier does not choose to file with the Commission, jurisdiction is retained by the States."
 
 
 [18]
 See Pennsylvania R. Co. v. Sharfsin, M.D.Pa., 240 F.Supp. 233, 235, vacated & remanded on other grounds, sub nom. Pennsylvania Public Utility Comm'n v. Pennsylvania R. Co., 382 U.S. 281, 86 S.Ct. 423, 15 L.Ed.2d 324 (1965), affirmed, 3 Cir., 369 F.2d 276 (1966), cert. denied, 386 U.S. 982, 87 S.Ct. 1288, 18 L.Ed.2d 231 (1967); Chicago & Eastern Ill. R. Co. v. United States, supra note 12, 308 F.Supp. at 648
 
 
 [19]
 A prior version of the bill referred in one section simply to "passenger service." The mistake was quickly brought to the attention of the Committee and the words "intercity rail" inserted before "passenger service" "to avoid the application of this section to commuter service." Supplemental Hearings, supra note 3, at 110
 
 
 [20]
 "The bill will apply only to intercity passenger trains and would not apply to service which is primarily commuter service." 116 Cong.Rec. (Part 11) 14164 (1970). "[T]his legislation * * * refers to intercity transportation of passengers by rail. It does not include commuter service. Of relevance here is the fact that the Senate has approved a bill specifically allocating $3 billion for commuter and other urban transportation. * * * Basically, commuter service is excluded from the bill * * *." Id. at 14178. See also note 19, supra
 
 
 [21]
 The ICC has recognized its continued jurisdiction over commuter trains if a railroad invokes that jurisdiction by filing a notice of discontinuance with the Commission. See Chicago S. Shore & S. Bend R. Restructuring of Pass. Serv., 342 I.C.C. 154, 179-180 (1972). See also Penn Central Transp. Co. Discontin. or Change in Serv., 338 I.C.C. 318, 320 (1971). Cf. Kennedy v. Baltimore & Ohio R. Co., supra note 17, 342 I.C.C. at 21
 
 
 [22]
 The complaint also alleged that the discontinuances were illegal because the discontinuance notices were posted prior to the signing of the contract with Amtrak, even though the discontinuances did not go into effect until after the signing of the contract. Appellant has not pursued this issue on appeal. If the issue is pursued further, of course, nothing we say here should be read as a reflection of our views on the merits of that issue
 
 
 [23]
 "The [Public Service] Commission [of the State of Maryland] may require the continuance of any service rendered to the public by any public service company under any franchise, right, or permit, after its expiration date, if any; and no service under a franchise, right or permit shall be discontinued or abandoned without the consent of the Commission, which shall be granted if the Commission finds that the present or future public convenience and necessity permits such discontinuance or abandonment." 7 Ann.Code of Md., Art. 78, Sec. 75 (1969)
 "No railroad or other public utility shall discontinue any regular passenger train, or other public service facility, or change any regular passenger train schedule or timetable, without first obtaining authority from the [Public Service Commission of the State of West Virginia] so to do * * *." 9 W.Va.Code Ann. Sec. 24-3-1 (1971).
 
 
 [24]
 See Kennedy v. Baltimore & Ohio R. Co., supra note 17. See also note 1, supra
 
 
 [25]
 See, e. g., 7 Ann.Code of Md., Art. 78, Sec. 99 (1969): "When the [Public Service] Commission [of the State of Maryland] is of the opinion that any public service company subject to its jurisdiction is violating or is about to violate any of the provisions of this article, it shall cause action to be brought in its name for mandamus or injunction * * *."
 
 
 [26]
 Once a notice of discontinuance is filed with the ICC, that agency can exercise administrative discretion and expertise in several ways. First, the ICC has the option of investigating the discontinuance or simply letting the discontinuance take effect. See City of Chicago v. United States, supra note 12, 396 U.S. at 165, 90 S.Ct. 309. Even if the ICC does enter into an investigation, the decision whether or not to enjoin the discontinuance pending the outcome of the investigation is also within the discretion of the ICC. "Upon the institution of such investigation, the Commission * * * may require such train or ferry to be continued in operation or service, in whole or in part, pending hearing and decision in such investigation, but not for a longer period than four months beyond the date when such discontinuance or change would otherwise have become effective." 49 U.S.C. Sec. 13a(1). (Emphasis added.) Finally, of course, the ICC uses its expertise in deciding whether to approve the discontinuance or whether continued operation of the train "is required by public convenience and necessity and will not unduly burden interstate or foreign commerce * * *." Ibid
 Where matters such as these are entrusted by statute to an administrative agency, the doctrine of primary jurisdiction requires that the parties not circumvent the agency by means of a court action. See Far East Conference v. United States 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). See also Trans-Pacific Airlines v. Hawaiian Airlines, 9 Cir., 174 F.2d 63 (1949).
 
 
 [27]
 In its complaint appellant requested that the District Court refer the intercity-commuter issue to the ICC, a procedure that some other courts have used. See, e. g., Illinois Commerce Comm'n v. Chicago & Eastern Ill. R. Co., 400 U.S. 987, 91 S.Ct. 449, 27 L.Ed.2d 434 (1971); In re Penn Central Transportation Co., E.D.Pa., 329 F.Supp. 572 (1971). See also In re Penn Central Transportation Co., 3 Cir., 457 F.2d 381 (1972). The ICC has already decided several such referral cases. See, e. g., Penn Central Transp. Co. Discontin. or Change in Serv., supra note 21; Penn Central Transp. Co.-Status of Pass. Serv., 338 I.C.C. 621 (1971); same, 338 I.C.C. 660 (1971); same, 338 I.C.C. 690 (1971); Chicago & Eastern Ill. R. Co. Discontinuance of Trains, 338 I.C.C. 714 (1971). We intimate no views at the present time as to either the propriety of such a referral in the instant case or the validity of the standards developed by the ICC in the above cited cases