UNITED STATES ET AL. *v.* CITY OF CHICAGO ET AL.

No. 386. Decided October 19, 1970*

PER CURIAM.

These cases are a sequel to our decision in *City of Chicago* v. *United States,* 396 U. S. 162, last Term. The Chicago & Eastern Illinois Railroad (C&EI) filed a notice under § 13a (1) of the Interstate Commerce Act, 72 Stat. 571, 49 U. S. C. § 13a (1), proposing to discontinue a pair of trains known as the "Georgian," operated by it between Chicago, Illinois, and Evansville, Indiana, and operated in conjunction with trains of the Louisville & Nashville Railroad (L&N) between Evansville, Indiana, and Atlanta, Georgia, crossing Kentucky and Tennessee en route. Part of this litigation grows out of the ICC's approval of the C&EI's discontinuance of the Chicago-Evansville segment of the "Georgian," evidenced by its termination of its investigation.

The L&N also operates the "Hummingbird" between Cincinnati, Ohio, and New Orleans, Louisiana. The

---

*Together with No. 387, *United States et al.* v. *Tennessee Public Service Commission et al.,* No. 396, *Louisville & Nashville Railroad Co.* v. *Tennessee Public Service Commission et al.,* and No. 410, *Chicago & Eastern Illinois Railroad et al.* v. *City of Chicago et al.,* also on appeal from the same court.

"Hummingbird" connects with the "Georgian" at Nashville, Tennessee, where coaches and sleepers are transferred between the two trains. Following the ICC's approval of C&EI's discontinuance, the L&N served notice of discontinuance of the "Hummingbird"[1] which the ICC also approved.

In *City of Chicago* v. *United States, supra,* we held that ICC decisions to discontinue such an investigation were reviewable and remanded the cases back to the District Court. That court then ordered consolidation and remanded back to the ICC for further hearings, holding that the notice served by the C&EI on the Governors of Illinois and Indiana and at every station along the Chicago-Evansville run was inadequate because the people of Kentucky, Tennessee, and Georgia, and the Governors of those States were not notified. The "Hummingbird" discontinuance was also remanded to the ICC because of its close relationship with the "Georgian." These appeals followed.

We note jurisdiction and reverse. Section 13a (1) provides:

> "A carrier or carriers subject to this part, if their rights with respect to the discontinuance or change . . . of the operation or service of any train . . . are subject to any provision of the constitution or statutes of any State . . . shall mail to the Governor of each State in which such train . . . operated, and post in every station, depot or other facility served thereby, notice . . . of any such proposed discontinuance or change."

This section, as we read it, required C&EI to give notice in Illinois and Indiana, the only States in

---

[1] No issue as to the adequacy of the notice given in the L&N proceeding is raised here.

which the line now in controversy has operated. No provision is made in § 13a (1) for notice to States served by connecting railroads which might be affected by a discontinuance.

The dissent finds ambiguity in the phrase "such train" in § 13a (1). It is argued that two interpretations of "such train" are possible: either the train of the C&EI between Chicago and Evansville or the "Georgian" between Chicago and Atlanta. By allowing discontinuance under § 13a (1), however, the ICC must have interpreted "such train" to refer to a train operated by one railroad only; and it was only the Chicago-Evansville discontinuance that was before it at the time. The Commission ruled that: "Copies of the notices were duly served and posted in the manner required by section 13a (1) and our rules and regulations thereunder."[2] 331 I. C. C. 447, 448. We defer on this issue to the definition of "train" given by the administrative agency which has oversight of the problem. See, e. g., Udall v. Tallman, 380 U. S. 1, 16–17; Bowles v. Seminole Rock Co., 325 U. S. 410, 417–418.

It is true that the C&EI and the L&N functioned in close harmony. Discontinuance of service on one line might have a substantial effect on the other. But this relationship is not unique in railroading. Congress is not unaware of the mutual interdependence of railroads. It designed a federal regulatory system that displaced a state regulatory system when the state system could defeat a carrier's attempt to discontinue a train. Hence we think it distorts § 13a (1) to treat it so as to require

---

[2] The regulation at the time provided for "[a] certificate [stating] that a copy of the notice * * * has been mailed to the Governor and railroad regulatory body of each State in which the subject train or ferry is operated." (49 CFR § 143.5 (j), formerly § 43.5 (j) (see 32 Fed. Reg. 5606)).

the giving of notice to States which had no regulatory power over the carrier.[3]

Accordingly, the decisions in Nos. 386 and 410 are reversed. Since Nos. 387 and 396 were remanded to the Commission solely because of their relation to Nos. 386 and 410, those decisions are also reversed. The causes are remanded to the District Court for review of any questions on the merits which may remain unresolved.

*It is so ordered.*

MR. JUSTICE HARLAN, with whom MR. JUSTICE BLACK joins, dissenting.

I think these cases do not lend themselves to summary disposition.

The Chicago & Eastern Illinois Railroad Co. and the Louisville & Nashville Railroad Co. jointly operated

---

[3] Until 1958 railroad discontinuances required approval of the appropriate regulatory agency in each of the States in which the line operated. Congress knew of the financial difficulties of the railroads and concluded that the problem of discontinuance had to be removed from its parochial setting where state agencies too often required the "maintenance of uneconomic and unnecessary services and facilities." S. Rep. No. 1647, 85th Cong., 2d Sess., 22. Therefore, Congress vested power over discontinuances in a body aware of the national transportation problems and needs. See generally *City of Chicago* v. *United States,* 396 U. S. 162 (1969), and *Southern R. Co.* v. *North Carolina,* 376 U. S. 93 (1964).

The problem of discontinuance of services as put to the Congress by the Association of American Railroads was described as follows: "[S]uch matters are subject to approval of State regulatory commissions and authority for such discontinuances or abandonments must be obtained within the scope of statutes or procedures under which those State commissions operate." Problems of the Railroads, Hearings before the Subcommittee on Surface Transportation of the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess., pt. 1, p. 25 (Jan. 13, 1958).

The legislation was responsive to that need and may not be easily construed to do more than track the jurisdiction of a State over the carrier in question.

a train known as the "Georgian" which provided passenger service between Chicago, Illinois, and Atlanta, Georgia. At Evansville, Indiana, between the two terminal points on the "Georgian" run, the railroad companies switched engines and train crews; passengers, however, could remain in the railroad cars and continue through to the end of the run. The Chicago & Eastern Illinois sought ICC approval of its discontinuance of the Chicago-Evansville portion of the run; notice of the proposed discontinuance proceedings was not served on the Governors and residents of the States served by the Evansville-Atlanta portion of the "Georgian" run. After our remand in *City of Chicago* v. *United States,* 396 U. S. 162 (1969), the District Court held that notice of the ICC discontinuance proceedings should have been given to the Governors and residents of all the States served by the "Georgian" run. The Court, in Nos. 386 and 410, now summarily reverses that decision, holding that § 13a (1) of the Interstate Commerce Act, 49 U. S. C. § 13a (1), requires that a carrier seeking to discontinue passenger service give notice only in those States having regulatory authority over the carrier.[1]

---

[1] Nos. 387 and 396 are appeals by the Government, the ICC, and the Louisville & Nashville Railroad Co. challenging the District Court's holding that the issues involving the discontinuance of the Louisville & Nashville Railroad Co.'s "Hummingbird" train are so factually related to the discontinuance of the "Georgian" run that the "Hummingbird" discontinuance should be remanded in light of the projected reconsideration of the "Georgian" discontinuance. In addition, the Louisville & Nashville Railroad Co., in No. 396, challenges the District Court's action in reinstating the September 6, 1968, restraining order entered by Judge Robson; that restraining order prohibited discontinuance of the "Hummingbird" trains pending resolution of the case in the District Court. On April 3, 1970, this Court stayed the District Court's action in reinstating the earlier restraining order. 397 U. S. 1019. The effect of today's opinion on the status of that restraining order is unclear.

The issue, in my opinion, is not one justifying summary resolution, as an examination of the Court's opinion indicates. The Court relies in the first instance on the absence of an explicit provision in § 13a (1) of the Act for notice to States served by "connecting railroads." However, the statutory provision in question is manifestly highly ambiguous with regard to the scope of the notice obligation in situations where two carriers, though subject to different state regulatory authorities, offer their services to the public in a manner which, from the consumer standpoint, is indistinguishable from passenger service offered by a single carrier. Section 13a (1) provides in relevant part:

> "A carrier or carriers . . . if their rights with respect to the discontinuance or change, in whole or in part, of the operation or service of any train . . . operating from a point in one State to a point in any other State . . . are subject to any provision of the constitution or statutes of any State or any regulation or order of (or are the subject of any proceeding pending before) any court or an administrative or regulatory agency of any State, may, but shall not be required to, file with the Commission, and upon such filing shall mail to the Governor of each State in which such train . . . is operated, and post in every station, depot or other facility served thereby, notice at least thirty days in advance of any such proposed discontinuance or change. . . ."

Appellants in Nos. 386 and 410 argue that since § 13a (1) accords carriers a right to commence discontinuance proceedings before the ICC if their rights with respect to the operation of train service are subject to any state regulatory authority, the scope of the notice requirement should be limited by the reach of the state regulatory power giving rise, in the first instance, to the carrier's right to go before the ICC. Appellees in

14

Nos. 386 and 410, for their part, contend that the notice requirement is geared to the areas through which "such train" is operated, not merely the areas reached by a State's regulatory power over the carrier. For my part, I find the language and structure of the statutory provision singularly opaque; and I am not aided in my choice between these competing constructions by the Court's observation that § 13a (1) makes no provision for notice in States served by "connecting railroads."

In view of the structural and linguistic ambiguity of the statutory provision, the Court's reliance on the absence of an explicit reference to carrier arrangements of this sort would carry weight only if the legislative policy underlying § 13a (1) of the Act solidly supported the result reached today. Lacking that, the description of congressional policy in n. 3 of the Court's opinion, *ante,* at 11, hardly warrants the Court's inference in the text of its opinion that the statutory purpose underpinning § 13a (1) is served by a limitation of the notice requirements according to the reach of the State's regulatory power over the carrier filing with the ICC.[2] Indeed, the concern with state regulatory parochialism, and the resulting burden on interstate commerce caused

---

[2] The disconnected nature of the Court's reasoning is nicely illustrated in n. 3 of its opinion, *ante,* at 11. We are offered two quotations—one from the Senate Report and the other from the Association of American Railroads—as legislative history supporting the Court's construction of § 13a (1). The substance of both clearly supports the view of § 13a (1) as seeking to remedy state regulatory parochialism. Unfortunately, neither quotation speaks to the question put in issue by the Court's rationale for summarily disposing of these cases; *i. e.,* whether the congressional decision to proffer an alternative national forum as a remedy for state parochialism is to be construed solely in light of the carrier interest in escaping state regulatory agencies. Yet the Court, after reciting these quotations, chooses to draw the inference that the statute cannot be easily construed to do more than serve that interest of the carriers. I must respectfully submit that this is a rather obvious *non sequitur.*

by economically wasteful passenger service arrangements, argue with at least equal force for an interpretation of the notice requirements of § 13a (1) as reaching beyond the relatively narrow parochial interests likely to be called forth by only a particular State's participation in a hearing on the discontinuance of multicarrier service.

Apparently, the Court recognizes the inherent ambiguity of the statute. Thus, its opinion finally comes to rest on the principle of deference to the administrative agency's construction of the statute. Suffice it to say that I am not persuaded by the deference argument as applied to the agency's *pro forma* finding of adequate notice in this very litigation where the notice issue evidently was not before the agency at the time of its ruling. See 331 I. C. C. 447, 448.

The above considerations are not meant to reflect any conclusions concerning the merits of the statutory construction issue presented in these cases. To the contrary, my point is simply that, without briefs and oral argument by the parties on the merits of the question, I would refrain from choosing between the conflicting constructions of § 13a (1) pressed upon the Court by the parties. Therefore, I would note probable jurisdiction in Nos. 386 and 410. I would withhold action in No. 387 pending dispositions in Nos. 386 and 410. In No. 396, I would note probable jurisdiction, limited to the questions concerning the District Court's action in reinstating the restraining order of September 6, 1968.