AMERICAN WATERWAYS OPERATORS, INC., et al., Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and

Southern Railway Company, Intervening Defendant.

AMERICAN COMMERCIAL BARGE LINE CO. et al., Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and

Southern Railway Company, Intervening Defendant.

Civ. A. Nos. 2322-72 and 2323-72.

United States District Court, District of Columbia.

Dec. 18, 1974.

A. Alvis Layne, Leo C. Franey, Washington, D.C., for plaintiffs, American Waterways Operators, Inc., and others.

Arthur L. Winn, Jr., Samuel H. Moerman, Paul M. Donovan, Washington, D. C., for plaintiffs, American Commercial Barge Line Co., and others.

Roger B. Andewelt, Dept. of Justice, Washington, D.C., for defendant, United States.

Betty Jo Christian, Interstate Commerce Commission, Washington, D.C., for defendant, Interstate Commerce Commission.

Charles A. Horsky, Washington, D.C., for intervenor defendant, Southern Railway Company.

Before ROBINSON, Circuit Judge, and BRYANT and SMITH, District Judges.

## OPINION

JOHN LEWIS SMITH, District Judge:

These related cases present for our review a determination by the Interstate Commerce Commission (Commission) that the Southern Railway Company (Southern) is not precluded by law from owning and operating a barge line subsidiary for the purpose of transporting coal along the Ohio and Tennessee Rivers.[1] The relevant statute is the Panama Canal Act of 1912 § 11, 37 Stat. 566, as amended, 49 U.S.C. §§ 5(14–16). Section 5(14) prohibits a railroad from having any interest in a water carrier with which the railroad "does or may compete for traffic."[2] Section 5(16)

---

1. Southern Railway Co. Appl., 342 I.C.C. 416 (1972).

2. Section 5(14) provides in pertinent part: ". . . it shall be unlawful for any car-

provides for an exception to this ban in cases where the Commission finds that the railroad's interest will (1) "not prevent such common carrier by water or vessel from being operated in the interest of the public and with advantage to the convenience and commerce of the people," and (2) "that it will not exclude, prevent, or reduce competition on the route by water under consideration." [3] Section 5(15) confers continuing jurisdiction upon the Commission to determine, after hearing, whether the existing or proposed railroad ownership of a water carrier violates § 5(14) and, if so, whether such ownership should be authorized under § 5(16). Such proceedings may be initiated either by the Commission or upon application of a railroad or other carrier.[4]

The instant case had its genesis in a plan conceived by Southern which involved the organization of a subsidiary barge line known as Southern Region Coal Transport, Inc. (SRCT) for the purpose of transporting coal from Illinois and Kentucky mine fields down the Ohio and Tennessee Rivers to a transloader owned by Southern at Sheffield, Ala-

bama, and thence by Southern's own rail system to landlocked power plants at various points in the Southeast. In August, 1970, Southern filed an application under § 5(15) requesting the Commission to find that its operation of SRCT as a barge subsidiary would not violate § 5(14) and even if it did, that it be authorized under § 5(16). Southern's application was referred to a hearing examiner who found Southern neither did nor would tend to compete with its barge subsidiary under § 5(14) if the application were granted. Although it was unnecessary for the hearing examiner to pursue his inquiry, he found that if the § 5(14) ban were applicable, § 5(16) would not save the arrangement.[5] The Commission accepted the hearing examiner's findings and conclusions of no competition under § 5(14) but rejected those under § 5(16), finding instead that the arrangement could be sanctioned under the latter provision notwithstanding a finding of competition under the former. For reasons set forth *infra*, we affirm the determination of the Commission under § 5(14) and accordingly pretermit consideration of the issues under § 5(16).[6]

rier . . . to own, lease, operate, control, or have any interest whatsoever (by stock ownership or otherwise, either directly, indirectly, through any holding company, or by stockholders or directors in common, or in any other manner) in any common carrier by water operated through the Panama Canal or elsewhere with which such carrier aforesaid does or may compete for traffic or any vessel carrying freight or passengers upon said water route or elsewhere with which said railroad or other carrier aforesaid does or may compete for traffic. . . ."

3. Section 5(16) provides in pertinent part: "Notwithstanding the provision of paragraph (14) of this section, the Commission shall have authority, upon application of any carrier . . . and after hearing, by order to authorize such carrier to own or acquire ownership of, to lease or operate, to have or acquire control of, or to have or acquire an interest in, a common carrier by water or vessel, not operated through the Panama Canal, with which the applicant does or may compete for traffic, if the Commission shall find that

the continuance or acquisition of such ownership, lease, operation, control, or interest will not prevent such common carrier by water or vessel from being operated in the interest of the public and with advantage to the convenience and commerce of the people, and that it will not exclude, prevent, or reduce competition on the route by water under consideration . . . ."

4. Section 5(15) provides in pertinent part: "Jurisdiction is conferred on the Commission to determine questions of fact, arising under paragraph (14) of this section, as to the competition or possibility of competition, after full hearing, on the application of any railroad company or other carrier. Such application may be filed for the purpose of determining whether any existing service is in violation of such paragraph . . . ."

5. Report of Hearing Examiner, F.D. No. 26310 (1971).

6. Our decision not to review the Commission's findings and conclusions under § 5(16)

The anticipated coal traffic which Southern seeks to haul over the combined water-rail route would come from as yet undeveloped coal fields located at Shawneetown, Illinois and Sturgis, Kentucky. Both coal reserves are owned by the Peabody Coal Co. and lie within ten miles of the Ohio River. Under Southern's proposal, the coal would be purchased by Southern Services, Incorporated, a wholly owned subsidiary of the Southern Company which in turn is a holding company for the southeastern utility destinations.[7] Southern Services, acting as shipper, would arrange for transportation of the coal by barge down the Ohio and Tennessee Rivers to a transloader owned by Southern Railway at Sheffield, Alabama.[8] Contracts for the water segment of the trip are to be awarded on the basis of competitive bidding. At Sheffield, the coal would be transferred from the barges to Southern's cars and transported over Southern road to various landlocked power stations. Under this scheme, Southern would be guaranteed the rail portion of the trip while its proposed barge subsidiary would have to bid on the water segment. The undeveloped Shawneetown and Sturgis mine fields lie in close proximity to the lines of the Louisville & Nashville (L & N) and Illinois Central (IC) railroads, respectively, with which Southern interchanges traffic. Transport of coal from these mine areas to the nearby barge docks must cross the paths of these common carrier lines. However, at present, there is no rail connection between the lines and the mine reserves. As a result, all-rail transportation of coal from the mine sites to Sheffield is presently not possible because while an all rail route exists between Southern's track at Sheffield and an area in close proximity to the undeveloped reserves, no way exists at these areas for moving coal onto common carrier track.

In translating the § 5(14) proscription against railroad interest in a water carrier with which it does or may compete for traffic, the Commission applied a two part test. First, the railroad and the railroad-controlled carrier must be found to serve two or more common points and second, they must be found to be actively competing for the same traffic or, except for the common ownership, it must be found that they would actively compete for the same traffic.[9] The portion of the route subjected to the § 5(14) competition test, was the water segment between the mine areas along the Ohio River and the Sheffield transloader facility on the Tennessee River. The Commission found that, notwithstanding the close proximity of the L & N and IC track over which Southern could route its traffic, no facility existed at the mine areas for placing coal onto cars using these lines. Accordingly, the Commission concluded that since Southern could not extend its rail service between the two points in question, Southern and SRCT did not serve two or more common points and hence the § 5(14) ban was inapplicable.

In their challenge to the Commission's decision, plaintiffs claim the Commission misinterpreted § 5(14) by applying the overly narrow two point test. In the alternative, they contend that the Commission's factual findings under § 5(14) are inconsistent and unsupported by substantial evidence.

Although sixty-two years have elapsed since the Act's inception, no court has ever passed on the interpretation given sections 5(14) and (16) by the

is based on the consideration that a finding of no competition under § 5(14) makes further examinations under § 5(16) unnecessary. We therefore intimate no view as to whether it was improper for the Commission to make additional findings under § 5(16).

7. Despite the similarity in names, Southern Railway Company has no corporate affiliation with Southern Services.

8. The watercourse from Shawneetown to Sheffield is 321 miles in length; that from Sturgis to Sheffield is slightly less.

9. 342 I.C.C. at 430.

Commission.[10] We look for guidance, therefore, not only to the Act's plain language, but also to its legislative history as well as to the construction given it by the Commission.

Historically, water movement by barge has proven economically more attractive than by rail over comparable distances.[11] In an effort to overcome this economic disadvantage, railroads bought up water competition and by applying their economic leverage, reduced water tariffs to the point of forcing independent water carriers off the rivers and lakes. The plain tendency of this acquisition scheme was to create a rail monoply over water traffic. That Congress was aware of this disturbing erosion of non-rail controlled water carriers is clearly apparent throughout the Act's legislative history.[12] Also prevalent in the Act's history is evidence of Congressional intent that the Act should be limited to aborting a railroad's interest in water carriers which ran parallel to its lines as opposed to proscribing interests in water carriers that were a mere extension of the rail route.[13] As the legislative history makes plain, Congress was not concerned with controlling broad concepts of actual and potential competition in relevant markets as these terms are used in contemporary antitrust litigation. Rather, Congress sought to insulate water carriers against a far narrower and more direct form of competition embracing traffic over parallel water and rail routes. While Congress obviously did not intend to give its concept of parallel route competition a narrow geometric meaning, it no doubt contemplated a situation basic to the Commission's position where the railroad and water carrier served two or more common points.

Further support for the Commission's two point test is also found throughout the Commission's consistent interpretation of § 5(14). The construction placed upon an act by the agency charged with its administration is generally accorded great weight and will ordinarily be affirmed if it has a reasonable basis in law. Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). See also United States v. City of Chicago, 400 U.S. 8, 10, 91 S.Ct. 18, 27 L.Ed.2d 9 (1970); Red Lion Broadcasting Co. v.

---

10. Lehigh Valley R. Co. v. U. S., 234 F. 682 (D.C.Pa.1916), aff'd, 243 U.S. 412, 37 S.Ct. 397, 61 L.Ed. 819 (1917), involved a challenge to the court's jurisdiction to enjoin a Commission order refusing to extend time for compliance with provisions of Section 11 of the Panama Canal Act of 1912 (now 49 U.S.C. § 5(14)).

11. For a brief history of the railroad's effect on water transportation on the Great Lakes, see Lake Line Applications, 33 I.C.C. 699, 712–14 (1915).

12. In reporting upon the House version of the bill which was to become the Panama Canal Act, the Committee on Interstate and Foreign Commerce discussed the purpose of Section 11 of the Act:

"The apprehension of railroad-owned vessels driving competition from the canal may or may not be exaggerated, but it is certain that the evil, which is only anticipated there, already exists in the coastwise trade on both coasts, as well as on our lakes and rivers. The evil is prevalent, recognized and complained of. The proper function of a railroad corporation is to operate trains on its tracks, not to occupy the waters with ships in mock competition with itself." H.R.Rep.No. 423, 62d Cong., 2d Sess. 12 (1912).

13. See the Conference Report describing an amendment to Section 11 (now 49 U.S.C. § 5(14)):

"Amendment No. 59 modified the House provision and limited the prohibition of railroads using common carriers to *parallel themselves*. . . ." H.R.Rep.No. 1197, 62d Cong., 2d Sess. 6 (1912). (Emphasis added.)

See also the debates on H.R.21969, 62d Cong., 2d Sess. (1912), and in particular the remarks of Representative Adamson, Chairman of the House Commerce Committee and sponsor of H.R.21969, in which he indicated no objection to railroads having interests in water carriers that acted as "feeders" but did intend the bill to prohibit efforts by railroads "to get possession of that watercourse that runs parallel to the railroad and take the business and raise the rates by excluding other ships. . . ." 48 Cong.Rec. 6591 (1912).

FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1962). Of higher significance, however, is the construction placed on an act by those administrators who participated in its drafting and directly made known their views to Congress. Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Udall v. Tallman, 380 U.S. 1, 16, 86 S.Ct. 792, 13 L.Ed.2d 616 (1965).[14] From its earliest decision under the Panama Canal Act, Application S.P. Co. in Re Operation S.S. Co., 32 I.C.C. 690 (1915), the Commission has consistently held that service between two or more common points is a necessary prerequisite to finding competition under § 5(14).[15] See also Lake Line Applications, 33 I.C.C. 699, reh. denied, 37 I.C.C. 77 (1915); Chicago & E.R.R., 34 I.C.C. 218 (1915); Central Vermont Boat Lines, 40 I.C.C. 589 (1916); Steamer Lines from Norfolk, 41 I.C.C. 285 (1916). Conversely, the Commission has held that a railroad neither did nor might compete with a water carrier when there was no common service between two or more points. Lake Tahoe Railway, 33 I.C.C. 426 (1915); S.P. Co. Ownership of the Schooner Pasadena, 33 I.C.C. 476 (1915) (as between Albion and San Francisco, Calif.); S.P. Co. Ownership of Oil Steamers, 34 I.C.C. 77, 81 (1915) (as between Alaska-Hawaii and San Francis-

co); Erie R.R. Co. Operation of Lake Keuka Nav. Co., 34 I.C.C. 212 (1915); Peninsular & Occidental S.S. Co., 37 I.C.C. 432, 434 (1915) (as between Miami and Nassau); Maine Central Boat Lines, 40 I.C.C. 272 (1916), 40 I.C.C. 272 (1916) (as to steamboats in Frenchman's Bay and Penobscot Bay); S.P. Co. Ownership of Atlantic Steamship Lines, 43 I.C.C. 168, 171 (1917) (as between New Orleans and Havana, and from Tampico, Mexico to Galveston, Tex., and Algiers, La.); Nashville, C. & St.L.Ry., Boats and Barges, 49 I.C.C. 737 (1918); Steamship Lines on Long Island Sound, 50 I.C.C. 634, 638–39 (1918) (as to Martha's Vineyard and Nantucket); Ocean S.S. Co. of Savannah, 203 I.C.C. 155, 163–64 (1934) (as between Boston and New York). We are satisfied that the Commission's test for competition under § 5(14) does have a rational basis in the Act's legislative history as noted *supra*, and comports fully with the interpretation placed upon the section by the Act's earliest administrators who, as the record suggests,[16] had firsthand familarity with the Act's drafting and passage.[17]

The Commission found the two point test not satisfied in this case on account of the absence of any connecting rail link at the proposed mine sites with nearby common carrier track.[18] The fact that Southern could run its cars from

---

14. Note the Senate debates on the conference committee report during which Senator Simmons stated that "it is my understanding that the provisions we are now discussing in the conference report [Section 11] was practically prepared by the Interstate Commerce Commission or by members of the Commission." 48 Cong.Rec. 11057 (1912).

15. In Southern Pac., 32 I.C.C. 690 (1915), the Commission dealt with the interpretation of the words "or may compete for traffic" concluding they

"do not mean a vague, possible though improbable competition, but mean a probable, potential competition as when the water line is entirely divorced from the railroad. We must therefore, look at the conditions as they will exist if this divorce is effected. From a practical view the question is, Will [sic] the steamship company, when free to consult only its own interests,

compete for traffic with the railroad line?" *Id.* at 694.

16. See note 14, *supra*.

17. It is also of significance that Section 11 of the Panama Canal Act was reenacted by Congress in the Transportation Act of 1940, 49 U.S.C. § 5(14). In this regard, the Supreme Court has held that "such a longstanding administrative interpretation, applying to a substantially re-enacted statute, is deemed to have received congressional approval and has the effect of law." C. I. R. v. Noel's Estate, 380 U.S. 678, 682, 85 S.Ct. 1238, 1240, 14 L.Ed.2d 159 (1965).

18. Basic to this finding is the conclusion that for a railroad to compete for traffic between two or more points, it is not necessary that its own rails provide single line service over the distance in question so long as it has benefit of through service on the rails of

Sheffield to points within a mile or two of the mine areas was immaterial if the coal from these areas could not practicably be loaded onto common carrier cars. The Commission, however, did not rest its inquiry at this point. It noted in this regard that its "function is to decide the competitive issue on the basis of facts presented to it *or which can be reasonably anticipated* and not on the mere possibility that a competitive rail route could be constructed." 342 I.C.C. at 432. (Emphasis added.)

The discretion conferred upon the Commission to decide issues of fact has been historically broad in cases, such as the instant one, arising under § 5 of the Interstate Commerce Act, as amended, 49 U.S.C. § 5. Northern Lines Merger Cases, 396 U.S. 491, 503, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970); Penn-Central Merger Cases, 389 U.S. 486, 498–499, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968); McLean Trucking Co. v. United States, 321 U.S. 67, 87–88, 64 S.Ct. 370, 88 L.Ed. 544 (1943). Addressing the issue of the court's function in reviewing Commission findings of public interest in § 5(2) merger cases under the Interstate Commerce Act, the Court in *Penn-Central Merger Cases, supra,* noted:

"With respect to the merits of the merger, however, our task is limited. We do not inquire whether the merger satisfies our own conception of the public interest. Determination of the factors relevant to the public interest is entrusted by the law primarily to the Commission . . . . The judicial task is to determine whether the Commission has proceeded in accordance with the law and whether its findings and conclusions accord with the statutory standards and are sup-

ported by substantial evidence." 389 U.S. at 498, 88 S.Ct. at 608 (1968). We see nothing in the language or history of § 5(14) which would cause us to depart from the review standards established for other portions of § 5. Accordingly, we restrict our examination of the Commission's findings to a determination of whether they are supported by substantial evidence in the record considered as a whole.

The record reflects the following uncontroverted evidence. At Shawneetown, Illinois, Peabody Coal Company presently operates two mines known as Eagle No. 1 and Eagle No. 2. Coal from Eagle No. 1 is transported to loading docks on the Ohio River by a five and one half mile conveyor belt. Coal from Eagle No. 2 is carried to the docks by Peabody's private standard gauge rail shuttle. Peabody has proposed that in the case of the undeveloped mine site known as Eagle No. 3, its private rail shuttle be extended to carry the anticipated traffic. Peabody also indicates it plans to use a similar rail shuttle or conveyor belt system between the mine area at Sturgis and the nearby Ohio River docks.[19] The private rail shuttle now serving Eagle No. 2 and the Ohio docks parallels and crosses a line shared by the L & N and the Baltimore & Ohio Railroad (B & O) but does not connect with the latter. Only Peabody's private line serves the dock, the L & N–B & O line coming to an end a short distance from Peabody's dock storage area.[20] At Sturgis, a line of the Illinois Central lies within two to three miles of the proposed site but it also makes no connection with these reserves.[21] There is no evidence to indicate that Peabody and the nearby common carrier railroads have ever sought to connect their crossing

---

other common carriers which do run between the points. Peninsular v. Occidental S. S. Co., 37 I.C.C. 432, 434 (1915); Lake Line Applications, 33 I.C.C. 699, 703–10; reh. denied, 37 I.C.C. 77 (1915). This construction is plainly founded on a common sense reading of § 5(14) and is fully consistent with the section's legislative history.

19. Report of Hearing Examiner, F.D.No. 26310 at 6, 13 (1971).

20. *Id.* at 14.

21. *Ibid.*

lines at Shawneetown. Moreover, none of the railroads serving southern Illinois and southern Indiana, including the B & O and the L & N, transports coal to the South from origins within twenty-five miles of the Ohio River.[22] Although the B & O and the L & N serve the West Kentucky fields, neither has been able to penetrate the Ohio River-oriented mines for purposes of transporting coal to the southeast utility destination here in question.[23]

The test for substantial evidence has been recognized as a standard going to the

> "reasonableness of what the agency did *on the basis of the evidence before it,* for a decision may be supported by substantial evidence even though it could be refuted by other evidence that was not presented to the decision-making body. . . ." United States v. Bianchi & Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 1414, 10 L.Ed.2d 652 (1963).

Substantial evidence has been accorded definitions of "more than a mere scintilla" and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). See also Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

As a point of departure in analyzing the competition issue in the present case, it can be said unequivocally that no point to point competition presently exists between Sheffield and the proposed Shawneetown and Sturgis mine sites. The record, furthermore, is totally devoid of any evidence supporting a reasonable expectation that such competition would develop when the mines are operating. On the contrary, the record demands an opposite conclusion. At the Sheffield mines now operating, there is no rail connection with the B & O–L & N tracks despite their close proximity and the fact they cross Peabody's private shuttle. Neither do the B & O nor the L & N transport coal from West Kentucky river-oriented mines to Southern Company's land-locked power plants. Even more significantly, no railroad at all serving southern Illinois and southern Indiana transports coal to the South from origins within twenty-five miles of the Ohio River. The record reflects no significant effort on the part of the L & N or the IC to win rail transport of the anticipated coal traffic from Shawneetown and Sturgis. It is not insignificant in this regard, that Southern, which had the option of developing an all-rail or water-rail route, chose the latter notwithstanding the obvious start-up and maintenance expenses which a barge line and transloader have over minor trackage extensions.

Central to plaintiffs' resistance of the Commission's findings, has been their contention that because the proposed mine areas are mere fields awaiting reduction to working mines, it would be absurd to expect that rail connections would exist between the fields and nearby common carrier track at such an early pre-development stage. The simple reply to this argument is that the Commission's conclusion of no competition is not based on the mere absence of rail connections alone. Were that the case, our decision might very well be different. The record as cited *supra,* is replete with substantial evidence supportive of the finding that Ohio River-oriented coal will move by water rather than rail to southeast utility destinations. It is the absence of current or reasonably foreseeable future movement

---

22. *Id.* at 15. Plaintiffs American Waterways Operators, et al., take partial exception to this statement. They note at least one mine area in Pike County, Indiana which originates coal via Southern to the Hammond power plant in Georgia. Reply Brief of Plaintiffs, C.A. 2322–72, p. 13–14. An examination of the relevant map, Exhibit 11, point No. 13, indicates this area sits just at a distance of twenty-five miles from the Ohio River and accordingly is not seen to invalidate the hearing examiner's finding on this matter.

23. *Id.* at 15.

of significant amounts of river-oriented coal by rail to the South, especially from the Shawneetown and Sturgis sites, that validates the Commission's findings. Should the factual posture of this controversy alter so that point to point competition can be reasonably anticipated, the Commission's continuing jurisdiction under § 5(15) will provide it with necessary procedures for reexamining the competition issue and if need be, raising the § 5(14) bar to continued ownership of SRCT by Southern.

Accordingly, the findings and conclusions of the Commission under § 5(14) are hereby affirmed.