JOHNSON, Justice.[1]
I,We granted this writ application to address whether the court of appeal erred in its application of a 1994 Department of Health and Hospitals (“DHH”) rule relative to the Medicaid per diem reimbursement rate due Women and Children’s Hospital (“WCH”) for its neonatal intensive care unit (“NICU”). For the following reasons, we affirm the decision of the court of appeal.

FACTS AND PROCEDURAL HISTORY

Established in 1965, the Medicaid program is designed to provide medical bene *399 fits to certain groups of low-income people. The Medicaid program is jointly administered by the federal and state governments pursuant to the Medicaid Act, 42 U.S.C. § 1396. Although the Federal government establishes general guidelines for the program, the Medicaid program requirements are established by each State. The Medicaid program is a voluntary program in which each state may choose to participate. At the federal level, the Department of Health and Human Services (“DHHS”) is responsible for administering the Medicaid program. The Centers for | ¡Medicare and Medicaid Services (“CMS”), an agency within DHHS, oversees the Medicaid program at the federal level.[2]
In order to receive federal Medicaid funding, states must have in effect a written state plan that has been submitted to and approved by DHHS. The Plan is essentially the state’s agreement that it will conform to the requirements of the Act and the official issuances of DHHS. The Medicaid state plan includes a variety of information, including the State’s rate-setting methodology. 42 U.S.C. § 1396a(a). The state Medicaid plan must be amended whenever necessary to reflect changes in federal statute, regulation, or court decisions and to reflect material changes in state law, policy, organization, or operation of the program. 42 C.F.R. § 430.12(C). Louisiana is a participant in the Medicaid program and administers its program via a state plan and amendments. Defendant, DHH, is the state agency which administers the Louisiana State Medicaid Program.
Effective for dates of service beginning July 1, 1994, the DHH promulgated a rule (the “1994 Rule”) establishing a new methodology that the agency would use to calculate Medicaid reimbursement payments for inpatient hospital services in non-state operated hospitals. The methodology involved prospective per diem rates for various peer groups of hospitals/units. The rule provided for the establishment of blended rates to be phased in over a three-year transition period “to minimize the impact from changing the reimbursement methodology.” For hospitals/units with costs “above the group’s weighted median for operations,” the 1994 Rule established different blends for each of the three years in the transition period. The Rule further provided that hospitals/units with per diem costs below their peer group rate “will receive their costs plus 25 percent of the difference between their costs and the peer | sgroup rate during the phase in period of three years.” It is undisputed that WCH falls within the peer group of hospitals/units with costs below the peer group rate. Included in the 1994 Rule, and at issue in this case, is the following language:
Initially all facilities within each peer group will be reimbursed at a blended rate for operating costs and movable equipment expenses. The purpose of the blended rate is to provide a phase-in period (3 years) culminating in a statewide flat peer group rate.
Effective for dates of service beginning July 1, 1995, DHH adopted an Emergency Rule which amended the 1994 Rule by eliminating the three-year transition period and providing that inpatient acute hospitals with per diem rates above their peer group rates would be paid the peer group rate rather than the previous blended rate. This Emergency Rule was later enacted as a final Rule in 1996 (“1996 Rule”). It is undisputed that these rules do not apply to *400 WCH because these rules do not apply to hospitals/units with costs below the peer group rate.
The Medicaid rate-setting methodology that is set out in Louisiana’s State Plan Amendment provides that for dates of service on or after July 1, 1994, “Medicaid reimbursement for inpatient hospital services ... will be made according to prospective per diem rates for various peer groups of hospitals/units.” As in the 1994 Rule, the rate-setting methodology in the State Plan Amendment establishes peer group per diem rates, and provides the methods for calculating the peer group per diem rates. For hospitals/units with below median costs,[3] the plan provides that “hospitals that had allowable operating cost per day less than the peer group component amount in the base year receive hospital-specific cost per day plus twenty-five percent (25%) of the difference between hospital-specific cost per day and the peer group rate.”
|4WCH, located in Lafayette, Louisiana, specializes in the care of women and children, providing an array of obstetrical, gynecological, pediatric, and neonatal care. WCH is enrolled as a Medicaid provider with DHH. Effective May 1, 1999, DHH granted WCH’s request for Level-Ill Regional status of its NICU, the highest designation available for such units. Generally, Level-Ill NICUs have the ability to care for the most complex and severely ill babies.[4]
On June 27, 2001, DHH notified WCH of the rate change that is at issue in this case. The rate letter essentially provided that WCH would be reimbursed a rate equivalent to its actual costs plus 25% of the difference between its costs and the peer group rate. WCH timely filed a “Request for Administrative Review” of the June 27, 2001 rate notice.[5] WCH took the position that the clear language of the 1994 Rule provides that it should be reimbursed at the peer group rate after the three-year transitional period.
On January 31, 2002, DHH denied WCH’s request for a rate increase. On February 28, 2002, WCH filed an administrative appeal. On March 18, 2004, the administrative law judge (“ALJ”) conducted a hearing on WCH’s administrative appeal, finding that: (1) the 1994 Rule did not provide the rate-setting methodology to be used after the transition period; (2) *401 the 1996 Rule did not establish the rate-setting methodology for hospitals with costs below the peer group rate; and (3) |Bas there were no rules providing the rate-setting methodology for hospitals with cost below the peer group rate, the State Plan must be applied. Accordingly, the ALJ found that DHH’s application of its rate-setting methodology was correct and should be upheld.
On June 8, 2004, WCH petitioned the district court to review the ALJ’s decision. On February 26, 2007, the district court heard the matter and denied WCH’s petition. On April 9, 2007, the district court signed a judgment affirming the decision of the ALJ, without providing written reasons. WCH filed a timely appeal.
The court of appeal reversed the ALJ and the trial court’s ruling, finding that DHH committed legal error in applying the State Plan and in not applying the 1994 Rule for hospitals/units with costs below the peer group rate. While noting that the actual reimbursement rate would be the same under the 1994 Rule as under the State Plan rate, the court of appeal remanded the case for further proceedings to determine WCH’s Medicaid reimbursement payment rate for services covered by the June 27, 2001 rate notification letter in accordance with the 1994 Rule.
WCH filed the instant writ application, arguing that the court of appeal disregarded the plain and express language of DHH’s 1994 Rule, which does not permit the “phase in” methodology to be applied to hospitals such as WCH after the end of the three-year phase in period. WCH asserted that the court of appeal erred in finding that the 1994 Rule does not clearly establish the peer group rate as the reimbursement rate at the end of the three-year transitional period.

DISCUSSION

Louisiana’s Administrative Procedure Act (“LAPA”) is set forth in La. R.S. 49:950 et seq. LAPA was enacted to establish certain procedures for state agencies for adoption of rules, adjudication of matters, and judicial review of administrative Rrulings. Specifically, LAPA sets forth the procedures requiring and governing the adoption of rules by each agency for that agency.
The procedure for an agency’s adoption of rules and emergency rules is set forth in La. R.S. 49:953. This statute requires an agency to publish notice of its intent to adopt, amend, or repeal any rule in the Louisiana Register. The agency must provide interested persons with copies of the intended rule, and it must offer them a reasonable opportunity to respond. The LAPA defines a rule as a “statement, guide or requirement for conduct or action ... which has general applicability and the effect of implementing or interpreting substantive law or policy, or which prescribes the procedure or practice requirements of the agency.” La. R.S. 49:951(6) (in pertinent part). The LAPA also provides that no rule is valid unless it was adopted in substantial compliance with the provisions of the LAPA. A rule is effective upon its publication in the Louisiana Register, unless provided for otherwise. La. R.S. 49:954. Further, no rule shall be effective or enforceable unless: (1) it was properly filed with the State Register, (2) a report on the rule was submitted to the legislature in accordance with La. R.S. 49:968, and (3) the approved economic and fiscal impact statements required by La. R.S. 49:953(A) were filed with the Department of the State Register and published in the Louisiana Register. Id.
The LAPA provides for judicial review over administrative adjudications. In pertinent part, La. R.S. 49:964(A) states, “a *402 person who is aggrieved by a final decision or order in an adjudication proceeding is entitled to judicial review.” Specifically, La. R.S. 49:964(G) provides:
The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
|7(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency’s determination of credibility issues.
Administrative construction or interpretation of rules is not binding on the courts, but in construing an administrative rule or regulation, a court must necessarily look to the administrative construction or interpretation thereof, where the meaning of the words used is in doubt, or is ambiguous, because such construction provides the best indication of the intent of the agency in promulgating a rule or regulation.
The United States Supreme Court set out the fundamentals regarding judicial interpretation of rules in Bowles v. Seminole Rock Co., 325 U.S. 410, 413-414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945):
Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words is in doubt. The intention of Congress or the principles of the Constitution in some situations may be relevant in the first instance in choosing between various constructions. But the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulations.
The Supreme Court has continued to follow Seminole and to give controlling weight to an agency’s interpretation of its own regulation.[6] The powerful effect Iscourts give most agency interpretations of the agency’s own regulations is based on the recognition that the agency is typically *403 in a superior position to determine what it intended when it issued a rule, how and when it intended the rule to apply, and the interpretation of the rule that makes the most sense given the agency’s purposes in issuing the rule. See: Richard J. Pierce, Jr., Administrative Law Treatise § 6:11 (2002).
Similarly, in Baton Rouge Water Works Company v. Louisiana Public Service Commission, 342 So.2d 609, 612 (La.1977), a case involving review of a regulatory body’s determination, this Court stated:
The general principle governing judicial review is that, where some evidence as reasonably interpreted supports the regulatory body’s determination, the orders of the Commission and other regulatory bodies exercising discretionary authority are accorded great weight and will not be overturned by the courts in the absence of a clear showing that the administrative action is arbitrary and capricious.
In this case, there appears to be no dispute that the 1994 Rule was adopted in compliance of the guidelines set forth in the LAPA. Thus, the issue becomes the proper application and interpretation of the 1994 Rule. Based on the above jurisprudence, we hold that the DHH’s interpretation of the 1994 Rule should stand unless it is arbitrary, capricious, or contrary to its rules and regulations.
At the center of the dispute in this matter is the interpretation of the following language from the 1994 Rule:
Initially all facilities within each peer group will be reimbursed at a blended rate for operating costs and movable equipment expenses. The purpose of the blended rate is to provide a phase-in period (3 years) culminating in a statewide flat peer group rate.
(Emphasis added).
I9WCH argues that DHH violated its own published rule by applying the State Plan’s rate-setting methodology instead of the methodology provided in the 1994 Rule. Specifically, WCH interprets the 1994 Rule as establishing the post-transition period reimbursement rate as the hospitals’/units’ appropriate peer group rates. WCH maintains that the State Plan’s methodology clearly conflicts with the 1994 Rule, as the State Plan Amendment provides that hospitals/units with operating costs below the peer group rates are reimbursed at a rate that is less than the peer group rates. WCH contends that DHH’s failure to apply its own 1994 Rule resulted in WCH receiving significantly lower Medicaid reimbursement payments than it was entitled to receive under the peer group rate established in the 1994 Rule. Further, WCH maintains that the State Plan is not a promulgated rule; and, by applying it to determine WCH’s NICU reimbursement rate, DHH violated the LAPA.
DHH takes the position that, according to the 1994 Rule, the rate-setting methodology was to be in effect for the three-year transition period that would ostensibly end in 1997. However, the 1994 Rule does not specifically state the reimbursement methodology to be applied after the three-year transition period. DHH notes that although the 1994 Rule provides that the purpose of the transitional “blended rate” was to culminate in a statewide flat peer group rate, the 1994 Rule was never amended, nor was there a subsequent rule enacted to formally state what a permanent rate may be. Thus, this created a situation where the transitional “blended rate” reimbursing WCH and similarly situated hospitals their actual costs plus 25% of the difference between their costs and the peer group rate essentially became the default statewide flat peer group rate. Moreover, DHH argues that this method *404 ology is the only rate-setting methodology receiving federal approval (through its inclusion in an amendment to the Louisiana State Medicaid Plan) necessary to receive critical federal financial participation in the reimbursement rate.
|inDHH admits that the State Plan rate-setting methodology relied upon in this matter is not a “rule” within the meaning of the LAPA, but, rather, is a contract provision that required federal approval to secure federal financial participation. The 1994 Rule is the implementing vehicle for the federally approved rate. DHH argues that, as the designated administrator for Louisiana Medicaid, it cannot employ a rate-setting methodology that is not mirrored in the Louisiana State Medicaid Plan. DHH also points out that all similarly situated hospitals receive payments based on this rate-setting methodology, thus there is no prejudicial effect on WCH.
Based on a review and interpretation of the language in the 1994 Rule and the 1996 Rule, the ALJ concluded that there were no rules establishing the rate-setting methodology after the transition period for hospitals with costs less than the peer group rate. In reaching this conclusion, the ALJ found that each rule “speaks for itself.” As to the 1994 Rule, the ALJ concluded that it “does not specifically state the reimbursement methodology to be applied after the three-year transition period.”[7] While the ALJ stated that WCH “has a valid argument that the 1994 Rule may have been intended to provide a uniform rate subsequent to the end of the three-year transition period,” she concluded “that rule simply does not do that.”[8]
The court of appeal reversed, finding that the ALJ’s refusal to apply the 1994 Rule to be legal error. Yet, the court essentially agreed that the correct reimbursement under the 1994 Rule would be the same as that being paid by DHH under the State Plan. The court of appeal found that while the 1994 Rule clearly established the rate setting methodology to be used during the transition period, it did Innot find that the language clearly established the peer group rate as the reimbursement rate at the end of the three-year phase-in period. Moreover, the court of appeal pointed out that the purpose of the blended rate was to minimize the impact of the new reimbursement system. The court noted that the 1994 Rule’s blended rate formula did not negatively impact hospitals/units like WCH (with costs below the peer group rate) because such hospitals are reimbursed more under the 1994 Rule than the prior system, and are reimbursed more than their actual costs. Thus, there is no negative impact on WCH which had to be minimized.
The court of appeal went on to state that while there is arguably some ambiguous language which could be interpreted in the way suggested by WCH, the record contained substantial evidence to support DHH’s interpretation. The court held that DHH’s interpretation was not contrary to the evidence, and its action was not characterized by an abuse of discretion.
The court of appeal further found that the rate-setting methodology set forth in the State Medicaid Plan, and relied upon *405 by DHH, was an invalid rule and unenforceable because it was not a rule enacted pursuant to the LAPA. The court of appeal held that because the DHH did not amend, repeal, or change the 1994 Rule’s rate-setting methodology for hospitals/units with costs below the peer group average, DHH committed legal error in not applying the 1994 Rule’s rate-setting methodology. The court of appeal remanded the matter to DHH to determine WCH’s reimbursement payment rate for services covered by the June 27, 2001 rate notification letter in accordance with the 1994 Rule. The court of appeal noted that both the State Plan and the 1994 Rule provide the same methodology (actual costs plus 25% of the difference between actual costs and the peer group rate), and thus the actual reimbursement payment owed to WCH would likely not be affected.
|12The record contains certain evidence presented at the administrative hearing which directly relates to the proper application and/or interpretation of the 1994 Rule, including: the 1994 Rule, the Emergency Rule, the 1996 Rule, the State Plan Amendment, testimony of current DHH employee, Debbie Gough, and the affidavit of a former DHH employee, Linda Welch.
Linda Welch was the Director of Institutional Reimbursement for DHH from 1988 through early 1995. During her tenure, DHH adopted and implemented the 1994 Rule. Her affidavit sets forth that the Regulation contains a three-year transition period, ending at the conclusion of the June 30, 1997 fiscal year, and that during the transition period, hospitals with operating costs below the peer group rate received their operating costs plus 25% of the difference between the peer group rate and their operating costs. She further states in her affidavit that the Regulation provides that each hospital in a peer group would receive the peer group rate after the transition period was completed. She asserts that the Department structured the Regulation in this manner to provide a reimbursement system that was more manageable than the previous cost-based system.
Debbie Gough, Program Manager with DHH, Bureau of Health Services Financing Rate and Audit Review, gave testimony on behalf of DHH, and disputed some of the contentions in Linda Welch’s affidavit. Ms. Gough has worked with Medicaid since 1992, and always worked within the hospital reimbursement area. Ms. Gough testified that the language in the 1994 Rule regarding reimbursement at the peer group rate refers to hospitals with costs above the peer group rate, not to hospitals with costs below the weighted median. She testified that the 1994 Rule and the State Plan clearly provide that if a hospital’s costs are below the peer group rate, the reimbursement is equal to costs plus 25% of the difference between costs and the peer group rate. She testified that the 1994 Rule does not provide what the | ^reimbursement would be after the phase-in period, and, thus, DHH referred back to the State Plan to determine the rate methodology. Ms. Gough testified that DHH is required to comply with the State Plan which governs hospital reimbursement in order to seek funding from the federal government.[9]
*406 Ms. Gough further testified that the Rule provides for blended rates for hospitals that were above the peer group rate, but for hospitals with costs below the peer group rate, they were supplemented and reimbursed at a rate of their own costs plus 25% of the difference in the peer group rate. She testified that there is nothing in the Rule that places these hospitals on the peer group rate after the phase-in period. She testified that the sentence in the Rule that states that the purpose of the blended rate is to provide a phase-in period culminating in a statewide flat peer group rate is only referring only to hospitals that have the blended rate with the costs above the peer group rate.
After reviewing the 1994 Rule, we find that it clearly establishes the rate-setting methodology to be used for all hospitals/units during the transition period. |uHowever, we do not find that the Rule language clearly establishes the rate-setting methodology to be used at the end of the three-year phase-in period.
The purpose of the 1994 Rule was to provide for prospective per diem reimbursements. The 1994 Rule states that the purpose of the blended rate was to provide a phase in period culminating in a statewide flat peer group rate in order to minimize the impact of changing to this new reimbursement formula. Thus, DHH formulated a methodology of reimbursement using blended rates with the intent to have a stated flat peer group rate after three years. Although that was the intent, no rule was ever instituted which set out the flat peer group rate, or provided for that flat peer group rate. Thus, while the intention was there, no rule was instituted. Conversely, DHH enacted additional rules in 1995 and 1996 to provide for a permanent flat rate for hospitals/units with operating costs above the peer group rate. The 1996 Rule ended the three-year rate-setting methodology transition period for hospitals with costs above the peer group rate by providing the transitional “blended rate” as the permanent rate-setting methodology for such qualifying hospitals.
Because we find that the Rule does not provide a formula for reimbursement after the three-year phase in period, we must determine the correct methodology for reimbursements to hospitals/units with costs below the peer group rate. Although WCH agrees with the court of appeal in its reversal of the ALJ’s reliance the State Plan, WCH argues the court of appeal nonetheless erred when it directed DHH to apply the rate established for the three-year transitional rule in 1994. DHH argues that the only rate and supporting rate-setting methodology that DHH can apply, that has CMS state plan approval for federal financial participation, is the one currently being paid to WCH. DHH asserts that all other hospitals with NICU costs below the peer group weighted medi *407 an are receiving per diem rates based on the same methodology applied to WCH, and if WCH is judicially granted a flat peer group rate, 11Rit will receive a federally unauthorized special rate not received by any other hospital, rather than the current federally authorized rate that was established through the rule making procedure set forth in the LAPA.
First, this Court agrees with the court of appeal’s finding that the rate provided for in the State Plan is not a “rule” within the meaning of the LAPA. There is no evidence in the record that the State Plan was enacted pursuant to the LAPA requirements, and DHH has admitted that the State Plan is not a rule under the LAPA. We also agree with the court of appeal that the 1994 Rule must be applied. As set forth above, the 1994 Rule was properly enacted under the guidelines of the LAPA. There is no dispute that this Rule was not amended or repealed by DHH. It is further undisputed that there was no subsequent rule enacted which applied a different reimbursement rate methodology for hospitals/units with operating costs below the peer group rate. Thus, because the 1994 Rule is still in effect, we hold that it must be applied and given the force of law in this case.[10]
Applying the 1994 Rule, we find that WCH is entitled to the “transitional rate” of reimbursement equal to its actual costs plus 25% of the difference between its costs and the peer group rate. While we acknowledge that DHH expressed an intent to have a flat peer group rate at the end of the three-year phase-in period, this was not accomplished in the 1994 Rule, nor was it accomplished by any rule amendment or subsequent rule. Furthermore, while not a formal rule pursuant to the LAPA, we find that the wording of the State Plan further supports our holding. The State Plan sets h ¿forth a formula for reimbursement for hospitals/units with costs below the peer group rate as costs plus 25% of the difference between costs and the peer group rate. Nowhere in the State Plan does it state that this rate is temporary, nor is there any indication that this methodology would change in any way after a set period of time. Thus, the reimbursement methodology that received federal approval was the so-called “phase-in” methodology. No other flat peer group rate was ever set out or submitted for federal approval. Thus, until DHH promulgates a new reimbursement rule for hospitals/units like WCH, the “transitional rate” in the 1994 Rule has, by default, become the permanent rate.
Moreover, although WCH complains that it is not being reimbursed fairly, resulting in millions of dollars in losses, we note that the reimbursement methodology complained of is applied the same across the board to all similarly situated hospitals. And, under this methodology, WCH actually receives reimbursement at a rate higher than its actual costs. WCH is treated in the same manner as any other hospital/unit that has costs below the peer *408 group average. There is no prejudicial effect on WCH.

CONCLUSION

For the above reasons, we affirm the decision of the court of appeal. We hold that the 1994 Rule must be applied in this case, and, under the 1994 Rule, WCH is entitled to reimbursement equal to the “transitional rate” of its actual costs plus 25% of the difference between its actual costs and the peer group rate.[11]

AFFIRMED.

. Calogero, C.J., retired, participated in this decision which was argued prior to his retirement.

. Formerly known as the Health Care Financing Administration ("HCFA”), CMS is the federal agency responsible for administering Medicaid.

. Although not applicable to WCH because its costs did not exceed the peer group’s median costs, to calculate the payment rates for “hospitals with cost per day above the peer group’s weighted median for operations for years subsequent to the 3-year transition period’’ and “hospitals with cost per day equal to or less than the peer group weighted median for operations,” the State Plan Amendment provides that "[r]ates are calculated annually by adding together the four components,” i.e., operating costs, movable equipment costs, fixed capital costs and medical education costs.

. WCH states that the majority of the patients treated in its NICU are those whose care is reimbursed by DHH through the Medicaid program.

.Twice before, WCH attempted to contest the DHH rate methodology. Contending that DHH did not follow the rate-setting methodology set out in its 1994 Rule and that WCH was entitled to the published per diem peer group rate for NICU Level-Ill Regional services, WCH attempted to appeal the initial rate notice. However, DHH notified WCH that its appeal was not timely, and the agency would not consider the appeal. On March 8, 2000, DHH sent WCH a notice that effective March 8, 2000, all per diem rates would be reduced by seven percent until the end of Louisiana's fiscal year, June 30, 2000. In response, WCH again attempted to appeal its reimbursement rate. However, DHH notified WCH that notice of the one-time reduction could not be used as a basis for filing a request for administrative review.

. See, for example: Federal Express Corp. v. Holowecki,-U.S. -, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008); National Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007); Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); North Haven Board of Education v. Bell, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982); Ford Motor Co. v. Milhollin, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); United States v. Larionoff, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); United States v. Chicago, 400 U.S. 810, 91 S.Ct. 18, 27 L.Ed.2d 9 (1970); INS v. Stanisic, 395 U.S. 62, 89 S.Ct. 1519, 23 L.Ed.2d 101 (1969); Thorpe v. Housing Authority, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

. In analyzing the 1996 Rule, the ALJ concluded that the "[ajlthough the 1996 Rule does specifically state the rate-setting methodology to be applied for those hospitals with particular units covered by the peer group rate with costs above the peer group rate, ... the 1996 Rule does not apply to those hospi-tais or particular units of hospitals covered by the peer group rate with costs less than weighted median of the peer group.”

. The trial court affirmed the ALJ’s decision without reasons.

. Ms. Gough was also questioned about a letter sent to DHH from HCFA (now CMS). The letter asked for clarification of certain information provided to the HCFA about the State Medicaid Plan amendment. One of the questions raised in the letter asked for clarification of the term “statewide flat peer group rate.” WCH introduced a handwritten letter by Ms. Gough dated December 30, 1994, that was obtained through a public records request, purportedly responding to the HCFA letter. Specifically, Ms. Gough wrote: "We *406 are proposing a peer-group median rate, where the rate is the same for all hospitals within a peer group. The proposed plan language has been revised to clarify this."
Ms. Gough testified that the handwritten letter contained her initial notes, and was never sent to HCFA. She testified that the purpose of the Rule was to set prospective rates, changing from a cost system of reimbursement. When asked what she meant when she wrote the above statement, Ms. Gough testified:
Well there is the same peer group. Anybody that's in a peer group, there is ... the peer group rate is the same. That doesn't mean they’re all paid the same, but each group is assigned a peer group rate based on the cost ... you know it's based on the cost for the hospitals that were in that group. But that doesn’t mean they are all assigned that rate. That rate is used to calculate the rate of those hospitals — each hospital in the group. It's a component in calculating the rate and then their cost is another component, their actual cost.

. Central Louisiana Electric Co. v. Louisiana Public Service Commission, 377 So.2d 1188, 1195 (La.1979)(''A legislative rule is clearly binding on the agency that issues it."); Maryland Casualty Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1920)("[A] regulation by a department of government, addressed to and reasonably adapted to the enforcement of an act of Congress, the administration of which is confided to such department, has the force and effect of law if it be not in conflict with express statutory provision. The law is not different with respect to the rules and regulations of a department of a state government.”); Pacific Gas & Electric Co. v. Federal Power Commission, 506 F.2d 33, 38, 164 U.S.App. D.C. 371 (1974)("A properly adopted substantive rule establishes a standard of conduct which has the force of law.”)

. Because WCH only timely appealed the June 27, 2001 rate letter, this opinion pertains only to reimbursement for the dates of service covered by that letter.